■ In the Matter of COUNCIL OF TRADE WASTE ASSOCIATIONS, INC., et al., Appellants, v CITY OF NEW YORK et al., Respondents

Petitioners, Council of Trade Waste Associations, Inc., which represents approximately 85% of the commercial refuse carters in New York City, and seven individual carting companies, argue on behalf of their regulated industry that respondent neglected to produce substantial evidence in support of its 1990 determination to lower commercial waste hauling rates effective May 6, 1991. The IAS court found that respondent adequately directed its efforts and rate-setting methodologies towards fulfilling its mandate of fixing maximum rates for the removal of refuse by calculating a fair rate of return for waste haulers and protecting consumers from excessive or unreasonable fees. However, this finding glosses over the question of whether the rates ordered by DCA are rationally based and supported by substantial evidence. *(See, Matter of Pell v Board of Educ.,* 34 NY2d 222, 231-232; *Matter of VR Equities v New York City Conciliation & Appeals Bd.,* 118 AD2d 459, 461.)

The record supports the conclusion that DCA relied upon assumptions about certain facts that are both contradictory and unrealistic. In addition, it employed inconsistent methodologies to calculate waste industry costs.

First, DCA's recommendation to lower the rate for waste disposal from the rate fixed in 1988 of $14.70 per cubic yard to

$13.60 originally ignored the fact that pre-compacted waste, for which DCA fixes a much higher rate of $46.70 per cubic yard, is disposed of along with non-compacted garbage. Although DCA later acknowledged that petitioners collect pre-compacted waste, it claimed the amount of such waste is not substantial. However, the record is bare as to respondent's definition of "substantial" and there appears to be no rational basis for the total exclusion of pre-compacted waste from its calculations, which very substantially diminishes the cost per cubic yard of collecting and disposing of refuse. Likewise, the assumption that no pre-compacted waste is collected is unwarranted by the record. It should also be noted that respondent ignores petitioners' argument that applying DCA's methodology, an assumption that only 3.75% of the refuse is collected in pre-compacted form would preclude any reduction in the 1988 rate.

Second, DCA's calculation of the waste disposal "tipping fee" aspect of petitioners' costs initially assumed a market rate of $33.07 per cubic yard based upon data from only one carter when the City's own rate at its Fresh Kills landfill is $40. Apparently acknowledging such anomaly, DCA later adjusted its assumption upward to $37 without offering any explanation as to how it reached this figure, which is still substantially below the City's own rate. In considering DCA's methodology, it is apparent that the inclusion of several companies which have Class 7 licenses permitting the collection of construction debris at unregulated rates and DCA's averaging technique gave disproportionate weight to Class 7 transactions, for which the dumping charges are much lower, thus heavily skewing the average tipping fee downward.

Third, an examination of respondent's calculation of and use of a compaction ratio of 7.4:1, which reflects the ability of a carter to reduce the volume of refuse collected more than sevenfold by mechanically crushing it in its trucks before it is dumped, appears unrealistic in that it distorts the impact of recycling upon the carters' ability to physically compact refuse in their trucks. In its answer to the petition, DCA for the first time defined compaction as not only the ability to physically compact loose refuse, but also the ability to reduce volume by separating recyclable materials from the waste stream. However, nowhere does DCA quantify the degree to which volume is reduced by recycling. In addition, it appears that the ability of the carters to recycle is limited and such recycling as is occurring is being done by their customers directly without involving the carters. Moreover, such compac-

tion rate, which represents a 50% increase in the 5:1 ratio utilized in setting the 1988 rates, appears to be impossible to achieve with present technology and is at variance with a Department of Sanitation study, completed in January of 1991, which shows a compaction rate for its trucks of only 3:1 to 4:1 and for private carters' trucks of only 3:1 to 5:1.

Fourth, DCA employs two separate methods, the so-called "House" and "Senate" analyses, to calculate, respectively, average operating costs and average waste disposal costs. Applying the House method, DCA took the total industry-wide costs and divided it by the total industry-wide amount of refuse collected, thus giving greater weight to larger companies. On the other hand, in calculating the average waste disposal costs, DCA used the Senate method, whereby it calculated the costs of each company per yard of waste and then took an average of each company's costs, thus giving equal weight to all companies regardless of size. Whether or not the Senate method would have been more favorable to petitioners had it been used in calculating operating costs and the House method would have been more favorable to them had it been used in calculating waste disposal costs, respondent's use of different averaging methods, when there is no rational basis for doing so and where the result is always unfavorable to petitioners, is clearly arbitrary and capricious.

Finally, it is unclear how DCA arrived at a 5% cost of living adjustment where the actual increase in labor costs under the carters' collective bargaining agreement was at least 5.88% for 1990 with another 2.4% wage increase scheduled to go into effect on June 1, 1991. Nor is there any support in the record for the figures allowed by DCA for officers' salaries or, in light of the submissions before it, a rational basis for its permitting each carter in its survey only one officer. Regarding the exclusion of the tipping fee from the calculation of an 11% profit margin in the refuse removal rates, such issue has previously been decided by us adversely to petitioners' position after the 1988 rate-fixing. (Presidents' Council of Trade Waste Assns. v City of New York, 159 AD2d 428.)

Thus, while respondent was not bound to use any single formula or combination of formulas in determining its rates, its use of inconsistent methodologies supports our decision to annul its rate-setting determination. (See, Matter of New York Tel. Co. v Public Serv. Commn., 64 AD2d 232, lv denied 46 NY2d 710.) While we cannot surmise or speculate as to how or why respondent reached a particular determination, its failure to adequately state a factual basis for many of its conclusions

forecloses the possibility of fair judicial review. *(See, Matter of Montauk Improvement v Proccacino,* 41 NY2d 913.)

In sum, while judicial review of an administrative determination does not permit the court to substitute its judgment for that of the agency, an arbitrary and capricious action may be annulled when the decision is not based on substantial evidence. *(See, Matter of Royal Realty Co. v New York State Div. of Hous. & Community Renewal,* 161 AD2d 404.) In the instant case, respondents' failure to produce substantial evidence in support of their rate-setting determination merits an annulment of such determination and a remand to respondent DCA for new rate-setting proceedings. Concur—Rosenberger, J. P., Kupferman, Smith and Rubin, JJ. *[See,* 152 Misc 2d 43.]