OPINION OF THE COURT
Bellacosa, J.
This appeal by the State comes directly to this Court (CPLR 5601 [b] [2]) from a Supreme Court judgment of unconstitutionality of chapter 635 of the Laws of 1998. The Act is challenged solely on a facial basis. We reverse and declare the statute constitutional. It does not violate article III, § 6 of the State Constitution, nor does it breach the governmental separation of powers doctrine. Also, it does not impinge on other constitutional protections asserted by plaintiffs.
L
On December 18, 1998, the Legislature passed and the Governor approved chapter 635. It states in pertinent part:
“1. * * * if legislative passage of the budget as defined in subdivision three of this section has not occurred prior to the first day of any fiscal year, the net amount of any such bi-weekly salary installment payments to be paid on or after such day shall be withheld and not paid until such legislative passage of the budget has occurred * * *.
“3. ‘Legislative passage of the budget’, solely for the purposes of this section * * * shall mean that the appropriation bill or bills submitted by the governor * * * have been finally acted on by both houses of the legislature in accordance with article seven of the state constitution and the state comptroller has *7 determined that such appropriation bill or bills that have been finally acted on by the legislature are sufficient for the ongoing operation and support of state government and local assistance for the ensuing fiscal year” (L 1998, ch 635, §§ 1, 2, amending Legislative Law § 5 [emphasis added]).
Plaintiffs include individuals who were in office and voted against passage of chapter 635, and others who were not yet in office at the time of its passage. These 14 individuals started a hybrid CPLR article 78/declaratory judgment lawsuit in April 1999 seeking: (1) a declaration of unconstitutionality of chapter 635; (2) a declaration of the unconstitutional nature of certain of the Governor’s actions; and (3) a permanent injunction against the withholding of legislative salaries. During the course of the litigation in the nisi prius court, plaintiffs limited their case to a pure declaratory judgment action, with requested relief directed solely at the constitutionality of the statute. The submissions of the respective parties were treated accordingly as cross motions for summary judgment.
Supreme Court held that chapter 635 violated the separation of powers doctrine and article III, § 6 of the New York State Constitution, but did not identify any particular constitutional provision as the flaw in its separation of powers conclusion.
The State defendants answer with six appellate arguments. They demonstrate cogently that: (1) chapter 635 complies with article III, § 6 of the New York State Constitution; (2) it conforms to separation of powers principles; (3) the specified role given to the Comptroller does not constitute an unconstitutional delegation of responsibility; (4) the statute does not interfere with plaintiffs’ First Amendment rights; (5) it does not impair their Federal Contracts Clause rights; and (6) it does not violate plaintiffs’ due process rights.
At this appeal stage of the controversy, we take judicial notice that the 1999-2000 budget negotiations concluded in early August 1999 with Legislative concordance and Gubernatorial acquiescence; Comptroller certification that the appropriations bills were sufficient to cover the State’s approved expenditures followed, within hours after enactment.
IL
This Court’s well-established review power with respect to matters of this kind marks the boundaries of the analysis required to decide this appeal. Because the plaintiffs seek facial *8 invalidation of chapter 635, they must initially overcome the presumption of constitutionality accorded to all enactments of a co-equal Branch of government (see, Dunlea v Anderson, 66 NY2d 265, 267-268; see generally, City of New York v State of New York, 76 NY2d 479; Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358; see also, National Assn. of lnd. Insurers v State of New York, 89 NY2d 950, 952 [quoting Alliance of Am. Insurers v Chu, 77 NY2d 573, 585]). In seeking facial nullification, plaintiffs bear the burden to demonstrate that “in any degree and in every conceivable application,” the law suffers wholesale constitutional impairment (McGowan v Bur-stein, 71 NY2d 729, 733).
Statutes are quintessentially the product of the democratic lawmaking process. These threshold hurdles are, therefore, erected in the public interest to provide a prudent set of procedural safeguards for enactors and defenders of statutes. They are set in place doctrinally and precedentially because of a fundamental premise that “[b]alancing the myriad requirements imposed by both the State and the Federal Constitution is a function entrusted to the Legislature * * *, the elective representatives of the people” (Matter of Wolpoff v Cuomo, 80 NY2d 70, 79).
This Court’s application of these principles, within standard constitutional review perspectives, convinces us that Supreme Court’s decision fails to adhere to these rigorous considerations.
IIL
Our analysis examines first a threshold component affecting this case — article III, § 6 of the State Constitution. It provides in pertinent part:
“Each member of the legislature shall receive for his services a like annual salary, to be fixed by law * * * Neither the salary of any member nor any other allowance so fixed may be increased or diminished during, and with respect to, the term for which he shall have been elected, nor shall he be paid or receive any other extra compensation.”
This Court has examined the constitutionality of earlier legislative salary arrangements in relation to this fixed star. In New York Pub. Interest Research Group v Steingut (40 NY2d 250), the Court invalidated the system of awarding allowances to legislators for varied services in a particular fiscal year, as part of the budget process in that same year. This Court recognized that:
*9 “the prohibition against increases and decreases in legislators’ compensation and emoluments during their terms of office would serve two salutary purposes — (1) to avoid a conflict of interest by removing from legislators the authority to vote themselves financial benefits at the expense of the public treasury, and (2) to forestall the possibility of manipulation of legislators’ votes by promises of reward or threats of punishment effectuated through changes in salaries or allowances” (New York Pub. Interest Research Group v Steingut, supra, at 258 [emphasis added]).
Significantly, the Court held that “the Constitution lays no constraint on the authority of one Legislature by enactment of general law to make provision prospectively for allowances to be received by the officers and members of the two houses during a succeeding legislative term or terms” (New York Pub. Interest Research Group v Steingut, supra, at 261 [emphasis added]).
Later, in Dunlea v Anderson (66 NY2d 265, supra), this Court upheld the salary increase for legislators in the 1985-1986 fiscal year, authorized by the Laws of 1984. The Court reaffirmed that article III, § 6 “does not prohibit one Legislature * * * from increasing the salaries of the next term’s members. Neither its language nor the intention of its drafters compel a contrary interpretation” (Dunlea v Anderson, supra, at 268). Indeed, the Court noted that when the current article III, § 6 was approved, the Constitution was specifically amended to provide the flexibility of allowing a salary to be fixed by legislators themselves:
“The purpose of empowering the Legislature to determine its own compensation * * * was to avoid ‘repeating] the error of inflexibility’ that had resulted from ‘fixing the compensation of legislators and legislative leaders in the Constitution, and thus failfing] to provide for changing conditions and circumstances’ ” (Dunlea v Anderson, supra, at 268; see also, Finn v City of New York, 282 NY 153, 157).
Dunlea built on Steingut’s holding that constitutional constraints do not generally prohibit prospective adjustments. It then distinguished Steingut by emphasizing that the judicially stricken allowances in the latter case were effective *10 during the same fiscal year in which they were appropriated. The Court also observed that the selective awards could be directly tied to votes on particular bills and were within the unilateral control of one legislative house leader, not the Legislature itself as a bicameral Branch of the government (see, Dunlea v Anderson, supra, at 268; see also, New York Pub. Interest Research Group v Steingut, supra, at 260).
We likewise adhere to Steingut’s definitive holding and guidance, while acknowledging its key distinguishing features. Demonstrably, the “manipulation” potentiality cautioned against in Steingut is not present at all in this case. Here, the withholding-of-salary protocol is general and purely prospective (see, New York Pub. Interest Research Group v Steingut, supra, at 258). Moreover, the statutorily authorized temporary withholding of net payments of legislative salaries operates by force of law and off a neutral pivot. The statutory consequence does not occur by selective whim, or as a constitutionally questionable quid pro quo within the enactment year.
By chapter 635 of the Laws of 1998, the Legislature prospectively “fixed by law” an annual salary for its members (NY Const, art III, § 6). The law imposes a discipline within the Legislative Branch itself regarding the timing and method of only its own net compensation (see, Finn v City of New York, supra, at 157). This mechanism does not interject an all-or-nothing infirmity because the “contingent” nature of its adopted timing-of-payment formula does not “un-fix” the salary, in constitutional terms.
Until 1948, legislative salaries were primarily “fixed” on a constitutionally permissible per diem basis, conditioned upon service; payment was made from time to time during the legislative session and the balance paid on final adjournment (see, Dunlea v Anderson, supra, at 268; see also, “The Compensation of Public Officials: Judges and Legislators”, Report of Temporary State Commn to Review the Compensation Received by Members of the Legislature and Judiciary [1972]).
The Legislature, even now, holds the constitutional key prospectively to authorize that legislators’ salaries be paid in one final lump sum at the end of a legislative session — after the work of that Branch has concluded and all its responsibilities discharged. Since it may do that, it surely could do what chapter 635 prescribes which is a lesser of the greater power. This is particularly so since the release of net checks and realization of payment is accomplished simply by passage of an *11 annual State budget, a principal constitutional duty prescribed for each legislative session (NY Const, art VII, § 4).
Thus, chapter 635 of the Laws of 1998 can in no way be viewed as a facial abridgement of the protections and specifications of article III, § 6 of the State Constitution. On the contrary, it satisfies the constitutional payment mandate, as delineated by this Court’s controlling precedents and guideposts, and serves as an incentive to complete constitutional budget obligations in a timely fashion.
IV.
The separation of powers question asserted by plaintiffs and adopted by the Supreme Court must next be considered. The trial court reached its conclusion that chapter 635 breached this principle with daunting words and images:
“The law impermissibly tips the fragile balance of powers that is the keystone of our system of government by threatening to impose on the Legislature a budget that is not the product of thoughtful deliberation and debate. To place any legislator or anyone in any branch of government under undue economic pressure in exercising his or her judgment, while expecting that person to act in accordance with his or her oath of office is illogical, unsound, and unconstitutional” (180 Mise 2d 643, 647-648).
These flourishes are no substitute for an analytically justified basis to invalidate chapter 635 of the Laws of 1998.
The doctrine has deep, seminal roots in the constitutional distribution of powers among the three coordinate branches of government (see, NY Const, art III, § 1; art IV, § 1; art VI, § 1; Clark v Cuomo, 66 NY2d 185, 189). Article III, § 1, plainly declares: “The legislative power of this state shall be vested in the senate and assembly,” which traditionally requires “that the Legislature make the critical policy decisions” (Bourquin v Cuomo, 85 NY2d 781, 784; see, Breitel, The Lawmakers, in 2 Benjamin N. Cardozo Memorial Lectures, at 776).
The courts are vested with a unique role and review power over the constitutionality of legislation (see, Marbury v Madison, 1 Cranch [5 US] 137 [1803]) which includes being the final arbiter of true separation of powers disputes (compare, Matter of King v Cuomo, 81 NY2d 247; Matter of Wolpoff v Cuomo, supra; Clark v Cuomo, supra; Bourquin v Cuomo, supra). But, *12 as our precedents demonstrate, the courts have their limitations, too, either doctrinally imposed or self-imposed. The restraints have evolved for prudential reasons, from an appreciation of the prescribed and proportioned role of the Judiciary, and out of an acknowledged interdependency in the fulfillment of plenary governmental responsibility.
Here, the process affected by chapter 635 is “‘[legislative passage of the [annual] budget’ ” in a timely fashion (L 1998, ch 635, § 2, adding Legislative Law § 5 [3]), a paramount State interest and goal (NY Const, art VII, § 4). The give-and-take compromises between the two essential lawmaking bodies over public revenues and their expenditures, by virtue of respective constitutional mandates to them, inextricably intertwines the Legislative and Executive Branches in a system of checks and balances. The objective of this specific constitutional investiture of power in those two Branches clearly contemplates a dynamic process and, ultimately, a joint venture designed to serve the common good.
The Governor proposes a budget, recommending appropriations (NY Const, art VII, § 3), and the Legislature may strike out or reduce items, as well as propose its own additions (NY Const, art VII, § 4). The Governor’s proposals, if enacted by the Legislature (both Houses acting in harmony), shall become law without further Executive action; appropriations for the Legislature and Judiciary and any proposed additional appropriations, however, are subject to the Governor’s further action (NY Const, art VII, § 4).
Chapter 635 of the Laws of 1998 adds procedural oil to this delicately calibrated mechanism. The Legislature, as a Branch of government, must have “finally acted on” the appropriations submitted by the Governor before individual legislators may be paid. The inducement does not require that the Legislature pass the Governor’s budget; only that it pass a budget (see, Senate Debate Transcripts, at 6622-6629, 6625-6626, Bill Jacket, L 1998, ch 635).
We further examine and now apply these principles to this lawsuit. The plaintiffs sue in this case as individuals, not as the Legislative Branch of government. They object to chapter 635 because, they say, it “permits the Governor to maximize his constitutional powers at the expense of the Legislature’s.” They hypothesize a situation where the Governor could submit a budget as late as possible and thus minimize debate and deliberation on the Executive proposals, in view of the *13 potentiality that legislators’ paychecks might be withheld should the debate continue, as occurred this year, without timely resolution by a legislative budget enactment. The plaintiffs complain that such a strategic initiative or thrust might hurry or dictate acquiescence by some legislators, and thus might constitute a violation of the separation of powers principle. They view this potentiality as a legally cognizable and constitutionally impermissible transfer of power from the Legislature to the Executive. We disagree and conclude that their arguments fail for various reasons.
First, all the legislators and the Legislature itself are entitled to the presumption that they act only in accordance with and fulfillment of their oaths of office. We fully accord them that presumption and respect. Next, one of the plain purposes of the separation of powers theory is to guard against one Branch seeking to maximize power (see, Breitel, The Lawmakers, in 2 Benjamin N. Cardozo Memorial Lectures, at 798). It is the correlative oversight of each lawmaking Branch over one another — in essence a dependency, rather than a separation — that balances the overall power to protect the public’s interests, not those individuals who occupy the offices of those Branches at varying times (see, e.g., Matter of King v Cuomo, 81 NY2d 247, 254, supra; see generally, The Federalist, Nos. 47, 48 [Madison]).
Although chapter 635 of the Laws of 1998 pinpoints a particular interdependence of the Legislature and Executive with respect to the budget-making process, it does not impermissibly merge or shift the powers between those two Branches. The leverage of negotiating positions is not the theoretical or functional equivalent of lawfully allocated governmental authority. In the end, the Legislature always does the legislating (see, Breitel, The Lawmakers, in 2 Benjamin N. Cardozo Memorial Lectures, at 779). This enduring role is highlighted by the fact that, despite the purported “sledgehammer” of chapter 635 (see, Senate Debate Transcripts, at 6622-6629, 6626, Bill Jacket, op. cit.), the 1999-2000 budget negotiations were concluded only after the second longest budget delay in the State’s history.
The balance wheels of the system are delicate, since the ultimate goal is to avoid the “whole power of one department [being] exercised by the same hands which possess the whole power of another” (The Federalist, No. 47 [Madison] [emphasis in original]; see also, Plant v Spendthrift Farm, 514 US 211). Yet, “it is institutional interdependence rather than functional *14 independence that best summarizes the American idea of protecting liberty by fragmenting power” (Tribe, American Constitutional Law, at 20 [2d ed] [emphasis in original]; see also, 4 Lincoln, The Constitutional History of New York, at 494, 497). The genius of the system is synergy and not “separation,” in the common connotation of that latter word.
Furthermore, assuming that the law does recalibrate some of the negotiating leverage, that shift has occurred as a direct result of the Legislature’s own bicameral action. Its official work was done qua Branch of the government, and the approved Act enjoys the ordinarily presumed validity of law, especially against a facial attack. The Legislature has decided to restrict itself and discipline its own work and power in this fashion. That is not a cognizable separation of powers problem in these circumstances, contrary to the novel restriction that the dissent would place on the Legislative Branch prospectively regulating its own affairs and proceedings. Rather, we view the adopted control mechanism as a credit to the Legislative Branch’s internal management practices, not a mark of some ultra vires surrender of power to any other Branch. Moreover, it should not be overlooked that, by this statutory change, both Houses came together with an identical bill in an effort and as an incentive to fulfill in a timely fashion their prescribed budget-related duties to the People of the State.
Another aspect of the motive behind the legislation is noteworthy. The self-imposed prod to attain the paramount State interest in achieving a timely budget is highly significant because achievement of that goal would guarantee salaries of all public employees being paid on time. Other entities, such as school districts, would also receive their State funds on time, thus avoiding the heavy interim borrowing burdens that are otherwise incurred. The argument of those who attack the statute does not come to grips with the unassailable fact that without a State budget or without messages of necessity and interim authorizations or continuing concurrent resolutions, no State expenditures could be made to anyone, including legislators. Thus, after a fiscal year concludes, and until a new budget is passed for the following year, the payment of compensation to legislators is inescapably contingent and dependent upon the extant Executive’s discretionary powers (see, NY Const, art VII, §5).
We have elsewhere declared that it is unwise for the courts “to substitute our own determination for that of the Legislature even if we would have struck a slightly different balance on *15 our own,” for it “is not the role of this, or indeed any, court to second-guess the determinations of the Legislature, the elective representatives of the people, in this regard” (Matter of Wolpoff v Cuomo, 80 NY2d 70, 79, supra). That wisdom remains a compelling injunction for this Court to honor and be guided by in this instance. There should be no misunderstanding, however, that when and where the Constitution requires the courts to act within prescribed authority, we do not hesitate to decide even the most sensitive governmental disputes (see, e.g., New York Pub. Interest Research Group v Steingut, supra; Matter of King v Cuomo, supra).
Just as the plaintiffs theorize about scenarios where the Governor may “force” legislators into budgetary submission, competing hypotheses may be composed. For example, the Legislature could simply have stricken some of the Governor’s proposed appropriations and offered no additions of its own. The State would then have had an instant budget over which the Governor would have had no subsequent, separate, constitutionally assigned role. The mere potentiality of this— and other — alternative hypotheses defeats the plaintiffs’ facial challenge, and answers the dissent’s conclusory assertion in this regard. We note that plaintiffs have adverted emphatically to Matter of King v Cuomo (supra), as a justification for the courts to intervene in this dispute. They miss a critical distinction, however, in the analysis and application of that case. The instant case is about whether the challenged statute is intrinsically a constitutional affront to the separation of powers doctrine. Matter of King v Cuomo, on the other hand, was a dispute about the very process itself of how enactments become law. There, the explicitly prescribed method of making law was at issue and at stake, and this Court found a fundamental deviation from the constitutional prescriptions. That decision is not at all apt here.
Finally, contrary to the assertion of those who would invalidate chapter 635 of the Laws of 1998, the Act does not create or result in “extortionate economic pressure.” We discern no substantially different economic duress created by chapter 635 than that which is inherent in the ordinary lawmaking process, budget-related and otherwise. Indeed, “the legislative process is deliberately exposed to the buffeting and the pressures of outside interests. This lends a responsiveness to the needs of the community as expressed by those interested” (Breitel, The Lawmakers, in 2 Benjamin N. Cardozo Memorial Lectures, at 777 [emphasis added]). A fortiori, the adoption of *16 a regimen and incentive predicated upon one Branch’s own resonance to a more efficacious discharge of its allocated and collective constitutional duties should not be disturbed by this Court.
Neither external nor internal pressures carry an inherent constitutional virus. We are satisfied that this rhetorical argument cannot justify this Court’s substitution of its preferences for how the Legislature should handle efforts that seek to affect its work (see, Matter of Wolpoff v Cuomo, supra, at 79). When the plaintiffs object to “economic pressure,” they are essentially attacking the fundamental, albeit rambunctious, realities of the political structure and process, including how public monies shall be allocated.
In the end, this issue and aspect of the lawsuit boil down to a debate about the constitutional calibration and allocation of lawmaking powers that underpin the prevailing system of governance in this State. No basis within the judicial review function supports the extraordinary superintendence and judicial nullification of chapter 635 that plaintiffs facially seek. This is not a case where a losing faction of legislators can secure from the courts the very result they failed to achieve in their one House of the Legislature, through legitimate debate and political persuasion (see generally, The Federalist No. 10 [Madison]).
V.
The plaintiffs further complain that chapter 635’s provision for the Comptroller to determine whether the budget is “sufficient for the ongoing operation and support of state government and local assistance” injects an unconstitutional delegation or power into the lawmaking process. We view this aspect of the case with the requisite “commonsense perspective” (Bourquin v Cuomo, supra, at 785; see also, National Assn. of Ind. Insurers v State of New York, supra, 89 NY2d, at 952 [quoting Alliance of Am. Insurers v Chu, 77 NY2d 573, 585]). That approach supports the conclusion that the Comptroller’s defined involvement fits within and fulfills his independent fiscal role as “a vital part of the constitutional machinery for assuring accountability in the expenditure of [State] funds” (Matter of McCall v Barrios-Paoli, 93 NY2d 99, 104).
Indeed, the State Constitution requires that the Comptroller “audit all vouchers before payment and all official accounts” (art V, § 1). “The payment of any money of the state, or of any money under its control * * * except upon audit by the *17 comptroller, shall be void” (id.), and the Legislature may assign duties “incidental to the performance of these functions” (id.). Thus, the Comptroller is required to “[superintend the fiscal concerns of the state” (State Finance Law § 8 [1]) and “[k]eep, audit and state all accounts in which the state is interested” (State Finance Law § 8 [2]). By chapter 635 of the Laws of 1998, the Legislature has plainly confirmed the Comptroller’s customary responsibility for ensuring the availability of revenues that would be expended through the enacted appropriations bills. This reinforcement in no way authorizes the Comptroller to “determine” when legislators shall be paid. That determination remains exclusively within the control, timing and power of the bicameral Legislature itself, acting as a Branch of Government when it enacts a timely budget, as is its constitutional duty.
Realistically, the Comptroller’s virtually immediate certification following the legislatively enacted budget in August refutes, in any event, plaintiffs’ theoretical and facially invoked constitutional concerns. His actions demonstrate the non-substantive nature — in the lawmaking sense — of the formal pre-audit imprimatur by that independent State officer.
VL
Additional arguments from all sides have been considered, and we find them to be without constitutional import in this case. The manner of enactment and the content and effect of chapter 635 of the Laws of 1998 neither violate nor implicate plaintiffs’ First Amendment, Contracts Clause, or due process rights.
Accordingly, the judgment of Supreme Court should be reversed, without costs, and chapter 635 of the Laws of 1998 should be declared constitutional.