[928 NYS2d 236]

LILLIAN ROBERTS, as Executive Director of District Council 37, American Federation of State, County and Municipal Employees, AFL-CIO, et al., Respondents, v HEALTH AND HOSPITALS CORPORATION et al., Appellants.

DANIEL DROMM, Member of New York City Council, District 25, et al., Respondents, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Appellant.

In the Matter of SEAN FITZPATRICK, as Business Representative and on Behalf of Local Union No. 3, I.B.E.W., AFL-CIO, et al., Respondents, v HEALTH AND HOSPITALS CORPORATION et al., Appellants.

First Department, July 7, 2011

### APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Scott Shorr, Francis F. Caputo* and *Eamonn Foley* of counsel), for appellants.

*Mary J. O'Connell*, New York City (*Steven E. Sykes* and *Aaron S. Amaral* of counsel), for Lillian Roberts and others, respondents.

*Broach & Stulberg, LLP*, New York City (*Robert B. Stulberg* and *Michael H. Isaac* of counsel), for Daniel Dromm and others, respondents.

*Greenberg Burzichelli Greenberg P.C.*, Lake Success (*Robert J. Burzichelli, Linda N. Keller* and *Genevieve E. Peeples* of counsel), for Sean Fitzpatrick and others, respondents.

### OPINION OF THE COURT

SWEENY, J.

These consolidated appeals from three CPLR article 78 proceedings once again raise the issue of the proper role of the

Judiciary in our coordinate branch system of government. Petitioners in each action seek to involve the courts in a decision-making process that lies squarely within the purview of the executive branch. While in appropriate circumstances, the courts may intervene to review such decisions, this power must be exercised sparingly (*Jones v Beame*, 45 NY2d 402, 406 [1978]). In these proceedings, for the reasons to be discussed, we decline to do so.

## The Parties

Respondent New York City Health and Hospitals Corporation (HHC) is a public benefit corporation formed by virtue of the provisions of McKinney's Unconsolidated Laws of NY § 7384 (New York City Health and Hospitals Corporation Act [L 1969, ch 1016, § 1, as amended (HHC Act)] § 4). The Legislature created HHC to address the need to provide "[a] system permitting legal, financial and managerial flexibility . . . for the provision and delivery of high quality, dignified and comprehensive care and treatment for the ill and infirm, particularly to those who can least afford such services" (McKinney's Uncons Laws of NY § 7382 [HHC Act § 2]).

HHC provides medical and treatment services to approximately 1.3 million New Yorkers annually through the operation of its 11 acute care hospitals, four skilled nursing facilities, six large diagnostic and treatment centers and more than 80 community-based clinics. It is administered by a board of directors appointed by the Mayor and City Council. It has a chief executive officer selected by the board "from persons other than themselves" who serves at the pleasure of the board (McKinney's Uncons Laws of NY § 7384 [1] [HHC Act § 4 (1)]).

Petitioners consist of elected officials, labor union representatives and union members. These petitions are brought to revisit certain layoff decisions made by HHC which will be discussed more fully herein.

In *Dromm v New York City Health & Hosps. Corp.*, petitioners are: (1) Daniel Dromm, Karen E. Koslowitz and Julissa Ferreras, three members of the New York City Council representing districts in Queens; and (2) Frank Spencer, the supervisor of the New York City District Council of Carpenters (the Carpenters Union) representing, inter alia, carpenters and supervisor carpenters employed by HHC.

In *Matter of Fitzpatrick v Health & Hosps. Corp.*, petitioners are: (1) Sean Fitzpatrick, the business representative of Local

Union No. 3, I.B.E.W. (the Electricians Union); (2) the Electricians Union in its own right, which represents HHC's supervisor electricians, electricians, and electrician's helpers; (3) Rodney Downes, an HHC electrician scheduled to be laid off; and (4) William LaRosa and Bill Lecomples, HHC electricians who were to retain their positions after the scheduled layoffs.

In *Roberts v Health & Hosps. Corp.*, petitioners are: (1) Lillian Roberts, the Executive Director of District Council 37 (DC37), a confederation of 55 local labor unions; (2) Kyle Simmons, the president of Local 924, the DC37 affiliate representing HHC laborers; (3) Trevor Moonsammy, an HHC laborer scheduled to be laid off; and (4) Victor Maduro, an HHC laborer scheduled to be laid off from his present position and reassigned to his previous title of "Service Aide."

## Facts

The underlying facts are essentially not in dispute.

In early 2009, in response to city budget cuts and other financial issues affecting its operations, HHC undertook to restructure its organization with a goal of making it more cost efficient. As part of this effort, HHC formed a "Restructuring Steering Committee" consisting of executives and network leaders from within HHC. It also retained Deloitte Consulting (Deloitte) to conduct a study of HHC at every level and propose various options to be considered by the steering committee in deciding how best to restructure the corporation. Deloitte was given a twofold mission: provide the steering committee with options to save approximately $1 billion while preserving HHC's main function of providing "patient care to all, regardless of ability to pay" and build upon HHC's "patient safety culture."

Deloitte spent nine months, including 2,000 pro bono hours, examining HHC's operations at all levels. It presented 100 options to the steering committee in a massive 1,000-page report describing the risks, mission impact and expected financial results of each option presented. The recommendation which underlies these proceedings called for the creation of "shared services operations and contracting out the management and/or provision of ancillary services" such as those provided by carpenters, electricians, laborers and plumbers. Included in this recommendation was the elimination of certain titles and the layoffs of some ancillary, i.e., nonmedical employees. It was estimated that this recommendation, if fully implemented, would save HHC approximately $141 million.

In April 2010, the steering committee discussed all of Deloitte's recommendations, rejected a number of the proposed options and decided which ones to implement. The steering committee determined that HHC could eliminate certain trades positions, including carpenters, electricians and laborers, while safely maintaining its facilities. This decision was made after consultation with the facility managers affected. In May 2010, HHC released a report announcing the steering committee's final cost-reduction decisions. Rather than reduce services or shutter facilities, HHC ultimately decided, inter alia, to eliminate, effective September 17, 2010, 45 of 136 carpenter positions, 45 of 156 electrician positions and 54 of 104 laborer positions, among others. The number of employees subject to these layoffs was lower than those recommended by Deloitte.

On September 15 and 16, 2010, in response to the proposed layoffs, the three instant petitions were filed.

## The Petitions

The *Dromm* petitioners seek an order pursuant to CPLR 6301, 7803 and 7805, and Public Health Law § 2801-c, preliminarily and permanently enjoining HHC from abolishing one third of its carpentry staff. Petitioners argue that the decision to abolish these positions violates McKinney's Unconsolidated Laws of NY §§ 7382 and 7385 (7) (HHC Act §§ 2, 5 [7]), which require HHC to operate, manage, superintend, control, repair, maintain and otherwise keep up its health facilities. They also claim violations of Public Health Law §§ 2800 and 2803, as well as specified Department of Health Regulations promulgated thereunder (10 NYCRR 405.24, 702.1, 702.2, 702.3, 711.2, 711.4). These regulations require HHC to maintain its health facilities in a manner so as to assure a safe and suitable environment for patients. Petitioners argue that HHC's decision to reduce its maintenance staff will create an unsafe condition for patients and staff members who remain employed at the affected facilities. It is claimed that HHC's decision demonstrates a failure to perform a duty enjoined upon it by law—namely, the maintenance of its facilities in a safe condition—and thus brings the petition within the ambit of CPLR 7803 (1) and (3).

The *Fitzpatrick* petitioners claim that HHC's scheduled layoffs would threaten the safety of electricians who retained their jobs. They seek declaratory and injunctive relief on substantially the same grounds as alleged in *Dromm*. Additionally, they claim that the scheduled layoffs would violate the

Merit and Fitness Clause of New York Constitution, article V, § 6, because HHC allegedly planned to hire private contractors to perform the work of laid-off HHC electricians. They also claim that HHC's layoff procedures violated Personnel Rules and Regulations of the City of New York (55 RCNY Appendix A) ¶ 7.6.3.

The *Roberts* petitioners assert claims and request relief that are substantially similar to those in *Dromm*.

The trial court issued temporary restraining orders (TROs) in the three proceedings on September 15 and 17, 2010, prohibiting the layoffs from going into effect. To date, no layoffs have occurred.

On October 8, 2010, the court issued an interim order holding that all petitioners had standing to pursue their claims against HHC. It then scheduled a consolidated hearing on the merits of petitioners' claims and to determine whether it should vacate the TROs or convert them into preliminary and permanent injunctions.

At the conclusion of the hearings, the court granted the petitions in their entirety. The court found, inter alia, that HHC's layoff decision was arbitrary and capricious; that HHC failed to employ a sound methodology designed to gather and evaluate all the relevant facts and assess the potential impact of the proposed layoffs on the health and safety of the patients, staff, and remaining tradespeople; that Deloitte used a flawed analysis in arriving at its layoff recommendations; that HHC did not conduct appropriate planning to minimize the impact of the proposed staff reductions; that "[t]he flaws in HHC's decision-making process . . . are numerous and profound" (2010 NY Slip Op 33319[U], *21); and that HHC did not develop an adequate health and safety plan.

The court remanded the matter for further evaluation by HHC consistent with the terms of its decision.

We now reverse.

## Standing

We begin with a review of the applicable Public Health Law provisions.

Public Health Law § 2800, entitled "Declaration of policy and statement of purpose," states in pertinent part:

> "Hospital and related services including health-
> related service of the highest quality, efficiently

provided and properly utilized at a reasonable cost, are of vital concern to the public health . . . [A]ll public and private institutions, whether state, county, municipal, incorporated or not incorporated, serving principally as facilities for the . . . rendering of health-related service shall be subject to the provisions of this article."

Public Health Law § 2801-c, entitled "Injunctions," states: "The supreme court may enjoin violations or threatened violations of any provisions of this article; and it may enjoin violations of the regulations of the department adopted thereunder."

The Health Department's Public Health and Health Planning Council adopts regulations, subject to the Commissioner's approval, to effectuate the provisions and purposes of article 28 (Public Health Law § 2803 [2] [a]). The petitioners claim that these regulations, specifically found at 10 NYCRR 405.1 *et seq.* and 10 NYCRR 702.1 *et seq.*, were violated.

Whether a person seeking relief from a court is a proper party to request an adjudication "is an aspect of justiciability which must be considered at the outset of any litigation" (*Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9 [1975]). Standing is thus a threshold determination that allows a litigant access to the courts to adjudicate the merits of a particular dispute that otherwise satisfies the other justiciability criteria (*see Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 769 [1991]).

In *New York State Assn. of Nurse Anesthetists v Novello* (2 NY3d 207, 211 [2004]), the Court of Appeals restated the well-established, two-part test for determining standing to challenge governmental action. The first prong of this test requires that a petitioner must demonstrate "injury in fact," meaning that he or she "will actually be harmed by the challenged administrative action." (*Id.*) The claimed injury, of course, "must be more than conjectural." (*Id.*) Moreover, a party must show that the injury suffered is personal to the party, i.e., "distinct from that of the general public" (*Matter of Transactive Corp. v New York State Dept. of Social Servs.*, 92 NY2d 579, 587 [1998]; *Matter of McAllan v New York State Dept. of Health*, 60 AD3d 464, 464 [2009]). The second prong of the test requires that the injury "must fall within the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted" (*Novello*, 2 NY3d at 211). This "zone of interests" test permits the court to ascertain the petitioner's status without reaching the merits of the litigation. It also

ensures that a group or individual "whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes" (*Society of Plastics Indus.*, 77 NY2d at 774). Here, petitioners fail to satisfy both the "injury in fact" and "zone of interests" prongs of the test to establish standing.

Viewed in its best light, petitioners' claim that the scheduled layoffs would leave HHC so short-staffed that HHC facilities would inevitably violate Public Health Law article 28, thus exposing them to "imminent" risk from "smoke, fire, bacterial, toxic and structural hazards," is speculative. Each construction trade (carpenters, electricians and laborers) maintained that the various facilities operated by HHC were already understaffed, as evidenced by the overtime worked and open repair tickets. HHC countered that, in many cases, the work performed by these trades was done after hours so as to minimize patient inconvenience, thus necessitating overtime. It also noted that many of the open repair tickets submitted at the hearing had in fact been closed. In addition, the construction trades alleged that work performed by outside contractors was inferior, although there was no evidence submitted to support this claim. Taken as a whole, however, petitioners' claims assert only threatened, not actual, violations of the Public Health Law. They point to no specific violation of any building code provision which will, as a result of these layoffs, actually occur and which will cause actual injury to them. Rather, petitioners approached the proposed layoffs globally, i.e., they essentially claim that the proposed layoffs would create the conditions for violations to occur at some unspecified future time. This is far too speculative and hypothetical to even approach the "injury in fact" requirement (*see Novello*, 2 NY3d at 214-215; *see also Rudder v Pataki*, 93 NY2d 273, 279 [1999] ["tenuous" and "ephemeral" harm is "insufficient to trigger judicial intervention"]). Additionally, this asserted "injury" is neither separate nor distinct from that of the public at large, including the numerous New York City residents who utilize HHC facilities and would presumably be affected by the purported deficiencies in these allegedly unsafe and understaffed facilities (*see Matter of McAllan*, 60 AD3d at 464).

Nor do petitioners find themselves within the zone of interests or concerns sought to be promoted or protected by the statutory provisions under which HHC acted. Indeed, the regulations

cited by petitioners that HHC allegedly violated mostly provide for the benefit and protection of the patients at hospitals and other medical facilities (see 10 NYCRR 405.24 ["The hospital shall be operated and maintained to ensure the safety of patients"]; 702.1 [d] [1] [hospitals must operate ventilation, heating and others systems to "provide for patient or resident health and comfort"]; 702.1 [e] [3] [buildings shall be maintained free of nuisances that may adversely affect patient health]; 711.2 [All medical facilities shall provide for proper, safe and efficient patient and resident care]). Any benefits HHC staff derives from those regulations are incidental. While petitioners also reference safety and maintenance regulations that mention neither patients nor staff (10 NYCRR 405.24 [c] [2] [a written preventive maintenance program shall be established and implemented to insure all buildings and equipment are operated and maintained in a safe and sanitary condition]; 702.2 [a] [the entire facility shall be maintained in good repair]; 702.3 [a] [buildings shall be maintained so as to prevent fire and other hazards to personal safety]; 711.4 [b] [general construction standards]), this merely demonstrates that HHC staff benefits incidentally from those regulations, not that the regulations were promulgated for their benefit. Such incidental benefit is insufficient to confer standing upon petitioners.

Moreover, to the extent that certain regulations cited by petitioners relating to hospital emergency policies, practices, plans and procedures do mention staff and personnel (see 10 NYCRR 405.3 [b] [9], [10]; 405.8 [b] [2]; 405.24 [b]; 702.3 [e]), the claimed violation of these regulations remains wholly theoretical and unsubstantiated. As noted above, what petitioners essentially argue is that these layoffs would create the conditions that would lead to some future, unspecified violations of health laws and regulations. Their injuries are potential, not actual. Petitioners fail to demonstrate how their vague and nebulous claims of possible injury from the alleged potential violations of these regulations relate to Public Health Law article 28's goals of "cost containment and the promotion of efficiency in health care planning" (Arnot-Ogden Mem. Hosp. v Guthrie Clinic, 122 AD2d 413, 414 [1986], lv denied 68 NY2d 612 [1986]). As a result, petitioners have failed to state a claim for entitlement to injunctive relief under Public Health Law § 2801-c, as petitioners can only claim threatened, not actual violations of the statute.

Even if we assume arguendo, that the claims of the City Council petitioners in Dromm were not speculative or common

with the public at large, those petitioners still lack standing to bring this petition. The trial court's reliance on *Matter of Powis v Giuliani* (216 AD2d 107 [1995]) and *Matter of Graziano v County of Albany* (3 NY3d 475 [2004]) is misplaced. *Powis* did not directly address the issue of whether an elected official had standing to challenge a fire department's decision to eliminate street fire alarm boxes. In fact, it was silent on this issue. *Graziano* involved an appointed, not elected official and does not specifically stand for the proposition that elected officials have standing to assert claims on behalf of their constituents. Of note is the fact that the Court of Appeals stated that an election commissioner "performs two distinct statutory functions—he assists his cocommissioner in the administration of the Board and he safeguards the equal representation rights of his party" (3 NY3d at 480). The Court denied standing to the petitioner election commissioner on his claims on behalf of the county board of elections, i.e., in his governmental capacity. It found however, that he had standing "in the language of the Constitution and the Election Law . . . in [his] unique role as guardian of the rights of his party and . . . from the constitutional and statutory requirement of equal representation" (*id.*). This is a far different situation than that presented here. We have previously held that legislator petitioners specifically have no standing because they "may not raise legal grievances on behalf of others" (*Urban Justice Ctr. v Pataki*, 38 AD3d 20, 27 [2006], *appeal dismissed and lv denied* 8 NY3d 958 [2007], citing *Society of Plastics Indus.*, 77 NY2d at 773).

Finally, contrary to the *Fitzpatrick* and *Roberts* petitioners' argument that HHC's layoff determination violated McKinney's Unconsolidated Laws of NY §§ 7382 and 7385 (7) (HHC Act §§ 2, 5 [7]), we note that neither provision imposes enforceable legal duties upon HHC (*see Matter of Hamburg v McBarnette*, 83 NY2d 726, 733 [1994]; *McAllan v Marcos*, 262 AD2d 192, 192-193 [1999], *appeal dismissed* 94 NY2d 791 [1999], *lv dismissed in part, denied in part* 95 NY2d 789 [2000]). In any event, Public Health Law § 2801-c authorizes injunctive relief only for violations of "any provisions" of article 28 of the Public Health Law or "the regulations of the department adopted thereunder," not for claimed violations of the Unconsolidated Laws.

Thus, the trial court should have dismissed the petitions in toto, as petitioners lacked standing and failed to state a claim for injunctive relief under the Public Health Law.

## Justiciability

■ The question of whether the scheduled layoffs would leave HHC with a sufficient staff to satisfy its statutory obligations presents a nonjusticiable controversy.

"One of the fundamental principles of government underlying our Federal Constitution is the distribution of governmental power into three branches—the executive, legislative and judicial—to prevent too strong a concentration of authority in one person or body" (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 355 [1985]). The principle of separation of powers has long been recognized as "included by implication in the pattern of government adopted by the State of New York" (*id.* at 355-356). "While the doctrine of separation of powers does not require the maintenance of three airtight departments of government, it does require that no one branch be allowed to arrogate unto itself powers residing entirely in another branch" (*id.* at 356 [internal quotation marks and citations omitted]; *see also Clark v Cuomo*, 66 NY2d 185, 189 [1985]).

The doctrine of justiciability is an "untidy" concept that "embraces the constitutional doctrine of separation of powers and refers, in the broad sense, to matters resolvable by the judicial branch of government as opposed to the executive or legislative branches or their extensions" (*Jiggetts v Grinker*, 75 NY2d 411, 415 [1990] [internal quotation marks omitted]). Although much has been written on this subject, it remains "a concept of uncertain meaning and scope" (*Flast v Cohen*, 392 US 83, 95 [1968]), one that is "more than an intuition but less than a rigorous and explicit theory" (*Allen v Wright*, 468 US 737, 750 [1984]). Cases that have presented nonjusticiable controversies involve political questions, advisory opinions, moot issues and those where there is no standing to maintain an action (*Flast*, 392 US at 95).

Part of the uncertainty in the doctrine of justiciability arises from the fact that the doctrine "has become a blend of constitutional requirements and policy considerations" (392 US at 97). Moreover, policy limitations are "not always clearly distinguished from the constitutional limitation" (*see Barrows v Jackson*, 346 US 249, 255 [1953]). The courts have the responsibility of determining whether a matter falls within the purview of another branch of government, or whether the action of that branch exceeds its constitutional authority (*Baker v Carr*, 369 US 186, 211 [1962]; *see also Cohen v State of New York*, 94 NY2d 1, 11 [1999]). However, as part of the tripartite constitu-

tional structure, courts must use this power prudentially so as to not encroach on the power of a coequal branch. Put another way, "[c]ourts at all levels are enjoined not to substitute their judgment for that of the coordinate branch of government to whom such judgment has been, in the scheme of a dividend [*sic*] government, primarily entrusted" (16A Am Jur 2d, Constitutional Law §§ 267, 268).[1]

Critics of the doctrine have argued that justiciability undermines the separation of powers doctrine because it restricts or even bars the exercise of judicial review, the main barrier which prevents unconstitutional action by the political branches. (*See for example* Erwin Chemerinsky, Interpreting the Constitution, at 1-24, 86-97 [1987]; Martin H. Redish, The Federal Courts in the Political Order: Judicial Jurisdiction and American Political Theory, at 4-6, 75-100 [1991].) Its defenders, on the other hand, argue that justiciability preserves the Judiciary's circumscribed role in our system of tripartite government (*see for example* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U L Rev 881, 890-899 [1983]).

While the doctrine of justiciability has evolved with the passage of time,[2] "[t]here is one recurrent theme: the court as a policy matter, even apart from principles of subject matter jurisdiction, will abstain from venturing into areas if it is ill-equipped to undertake the responsibility and other branches are far more suited to the task" (*Jones*, 45 NY2d at 408-409). This is particularly true in those cases that involve political questions, which involve "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the legislative and executive branches" (16A Am Jur 2d, Constitutional Law § 268). "The nonjusticiability of a political question is primarily a function of the separation of powers," which requires a case-by-case analysis (*Baker*, 369 US at 210).

---

1. This has been a basic restriction on judicial power since the earliest days of the Republic. (*See* Alexander Hamilton, Federalist No. 78.)

2. For an excellent review of the origins, evolution and suggestions for the future of the doctrine of justiciability, see Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo-Federalist Approach* (81 Cornell L Rev 393 [1996]). Professor Pushaw argues that the twentieth century saw an erosion of the traditional principles of the doctrine of justiciability laid down by the Founders, particularly the Federalists. This in turn has created the uncertainty in "meaning and scope" of the doctrine as the Court in *Flast* noted (392 US at 95). He argues that a return to Federalist principles, adapted to modern jurisprudence, will bring more clarity to the doctrine of justiciability.

It is axiomatic that each branch of government "should be free from interference, in the lawful discharge of duties expressly conferred, by either of the other branches" (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233, 239 [1984]). "The lawful acts of executive branch officials, performed in satisfaction of responsibilities conferred by law, involve questions of judgment, allocation of resources and ordering of priorities, which are generally not subject to judicial review" (*id.*; *see Matter of Abrams v New York City Tr. Auth.*, 39 NY2d 990, 992 [1976]; *see also Matter of Civil Serv. Empls. Assn., Inc., Local 1000, AFSCME, AFL-CIO v County of Erie*, 43 AD3d 1341, 1342 [2007]). This general rule is, however, subject to the exception that a court may "prevent a member of the executive branch from acting ultra vires, in bad faith, or arbitrarily" (16A Am Jur 2d, Constitutional Law § 272).

The need for deference on the part of the Judiciary for the other two branches of government, where appropriate, is an important concept that has long been recognized, particularly since the courts are the ultimate arbiters of the State Constitution (*see e.g. Cohen v State of New York*, 94 NY2d 1, 11 [1999]). The doctrine of separation of powers generally will preclude a court from intruding upon " 'the policy-making and discretionary decisions that are reserved to the legislative and executive branches' " (*Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006], quoting *Klostermann v Cuomo*, 61 NY2d 525, 541 [1984]; *see also Matter of Montano v County Legislature of County of Suffolk*, 70 AD3d 203, 210 [2009]).

At the same time, however, "it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them" (*Campaign for Fiscal Equity v State of New York*, 100 NY2d 893, 925 [2003]). The competing obligations between the Judiciary's responsibility to safeguard rights and the necessary deference to be paid to the policies of the other two branches of government create a tension that must remain in balance.

> "While it is within the power of the judiciary to declare the vested rights of a specifically protected class of individuals, in a fashion recognized by statute, the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government" (*Matter of New York State Inspec-*

*tion, Sec. & Law Enforcement Empls.*, 64 NY2d at 239-240 [citation omitted]).

Simply put, "[w]hen [the courts] review the acts of the Legislature and the Executive, we do so to protect rights, not to make policy" (*Campaign for Fiscal Equity*, 8 NY3d at 28; *see also Matter of Maron v Silver*, 14 NY3d 230, 261 [2010]).

Inasmuch as the Legislature saw fit to give HHC the discretion to determine the number of nonmanagerial employees necessary to carry out its mission (McKinney's Uncons Laws of NY § 7385 [12]; § 7382 [HHC Act § 5 (12); § 2]), HHC's decisions regarding staffing levels are beyond judicial review. Petitioners here have failed to identify any provision of the Public Health Law, Unconsolidated Laws, or any regulations requiring HHC to employ maintenance staff at a specific level or to determine maintenance staff levels in accordance with a particular standard or formula. Statutory requirements that public agencies maintain their facilities in a safe and sanitary condition do not give rise to judicially enforceable rights to employment of maintenance staff at any given level (*see Delgado v New York City Hous. Auth.*, 66 AD3d 607, 608 [2009]).

Financial and budgetary considerations presented HHC with a Hobson's choice: either reduce its expenses by various means, including layoffs of some staff, or violate its statutory mandate to provide cost-efficient medical services by reducing or shuttering medical services and facilities. The Legislature, by statutory provision, saw fit to put these types of decisions squarely within HHC's executive function (McKinney's Uncons Laws of NY § 7382 [HHC Act § 2]). By annulling HHC's layoff determination and mandating that it continue to employ workers identified for layoffs until it came up with a plan which passed judicial scrutiny, the court improperly inserted itself into executive branch decision making by interfering with HHC's exercise of its statutory authority.

Petitioners' claims that HHC's decision to reduce maintenance staff would result in the creation of an unsafe workplace do not salvage their petitions. In addition to being far too speculative to rise to the level of an injury in fact, those claims clearly present a nonjusticiable controversy. "The statutory right to a safe workplace may not be enforced by means of a remedy at law which would require the judiciary to preempt the exercise of discretion by the executive branch of government" (*Matter of New York State Inspection, Sec. & Law Enforcement Empls.*, 64 NY2d at 237; *McKechnie v New York City Tr. Police Dept. of N.Y. City Tr. Auth.*, 130 AD2d 466, 468 [1987]).

Neither the petitioners nor the courts should be permitted to substitute their judgment for the discretionary management of public business by public officials, as neither have been lawfully charged with that responsibility (*see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219, 232 [2007]; *Matter of Abrams*, 39 NY2d at 992). Petitioners, "however sincerely motivated, may not interpose themselves and the courts into the management and operation of public enterprises" (*Jones*, 45 NY2d at 407 [internal quotation marks omitted]).

## HHC's Decision was Not Arbitrary and Capricious

■ We also note that, even assuming, arguendo, that petitioners had standing, HHC's layoff decision was not arbitrary and capricious and was founded on a rational basis (*see* CPLR 7803 [3]).

Initially, the court improperly utilized a "substantial evidence" test in determining that HHC's methodology in determining its layoff policy was unsound. There was no administrative hearing held or required prior to HHC's determination, and thus, application of the "substantial evidence" test was misplaced (*see* CPLR 7803 [4]; *cf. Matter of Council of Trade Waste Assns. v City of New York*, 179 AD2d 413 [1992], *lv denied* 79 NY2d 755 [1992]). Indeed, the record before us clearly shows that HHC's layoff decision was rational in light of the imperative to reduce costs in conjunction with its mandate to provide medical services to all. The undisputed facts show that HHC took its massive restructuring effort seriously, as evidenced by the creation of a high level steering committee, and retention of Deloitte's services as an outside consultant to assist in a review of all of its current operations. Its instructions to Deloitte were to prepare cost-cutting/revenue-enhancing options consistent with HHC's mission of providing medical services to all, regardless of ability to pay. After a nine-month review of HHC's operations, Deloitte provided the steering committee with a voluminous report detailing 100 cost-cutting options as well as presenting the risks and mission impact of each. The committee reviewed those recommendations and selected 39, including the option of laying off trades workers rather than medical staff or closing clinics or other facilities. It rejected Deloitte's option of eliminating 14 outpatient clinics and four long-term-care facilities, as well as the option of closing or repurposing hospitals. Indeed, the steering committee demonstrated its thoughtful review of those options by, inter alia, reducing the targeted

maintenance savings to 30% of the potential $160 million Deloitte had recommended. The steering committee decided to lay off 293 of HHC's trades staff, rather than the 421 recommended by Deloitte. The network leaders presented that proposal to HHC's medical facility managers who provided feedback to the steering committee based upon their expert knowledge of facility conditions. In arriving at its layoff decision, the steering committee specifically took into account the fact that any HHC facility may obtain additional trades workers, should the need arise, by borrowing them from other HHC facilities, utilizing an HHC requirements contract, or, as a last resort, invoking emergency contracting procedures.

The court, in rejecting HHC's layoff decision, relied heavily on petitioners' expert, Dr. John Shershow, who was critical of the methodology used by Deloitte in determining staffing levels. He opined that a different methodology, utilizing data from past inspections, should have been utilized in determining proper staffing levels at each HHC facility. When the expert was asked on cross-examination by HHC's counsel as to his opinion of HHC's decision-making methodology, the court improperly sustained petitioners' objection, ruling that the effect of HHC's decision, not how it came to those decisions, was at issue.

The court improperly rejected HHC's layoff decision as methodologically unsound. In doing so, the court ignored the fact that there was no evidence, statutory, regulatory or otherwise, that mandated HHC to utilize any particular methodology in making its staffing determination. Simply put, the court disagreed with the manner in which HHC arrived at its decision and therefore rejected the result. However, while judicial review must be meaningful, the courts may not substitute their judgment for that of the agency, "for it is not their role to weigh the desirability of any action or [to] choose among alternatives" (*Akpan v Koch*, 75 NY2d 561, 570 [1990] [internal quotation marks omitted]).

There is nothing in this record which remotely demonstrates that HHC arrived at its decisions in bad faith or without adequate facts or deliberation. In fact, the record demonstrates exactly the opposite. Since HHC's staffing determination had a rational basis, we find no reason to disturb it (*Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222 [1974]; *Matter of Riverkeeper, Inc.*, 9 NY3d at 232).

We have considered the petitioners' remaining arguments and find them to be unpersuasive.

Accordingly, the orders and judgments (each one paper) of the Supreme Court, New York County (Alice Schlesinger, J.), entered December 13, 2010, which granted the petitions to annul the determination of respondent HHC to lay off carpenters, electricians and laborers, respectively, at its facilities, should be reversed, on the law, without costs, the injunctions vacated, the petitions denied and the proceedings brought pursuant to CPLR article 78 dismissed.

ANDRIAS, J.P., CATTERSON and RENWICK, JJ., concur.

Orders and judgments (each one paper), Supreme Court, New York County (Alice Schlesinger, J.), entered December 13, 2010, reversed, on the law, without costs, the injunctions vacated, the petitions denied and the proceedings brought pursuant to CPLR article 78 dismissed.