[950 NE2d 118, 926 NYS2d 382]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KEN-
NETH HAYES, Appellant.

Argued March 23, 2011; decided May 10, 2011

## POINTS OF COUNSEL

*Legal Aid Society, Criminal Appeals Bureau*, New York City (*John Schoeffel* and *Steven Banks* of counsel), for appellant. I. In this justification case which turned on the question of who first produced the knife, a police sergeant who heard two witnesses independently state that it was the wounded man—and not appellant—who had done so had a *Brady* duty to request their contact information, or to take some other reasonable step to preserve the exculpatory information in a form that would make it possible for a defendant to investigate it and to use it at

a trial. (*Brady v Maryland*, 373 US 83; *Youngblood v West Virginia*, 547 US 867; *Strickler .v Greene*, 527 US 263; *People v Hunter*, 11 NY3d 1; *People v Vilardi*, 76 NY2d 67; *United States v Bagley*, 473 US 667; *Kyles v Whitley*, 514 US 419; *United States v Agurs*, 427 US 97; *Giglio v United States*, 405 US 150; *People v Wright*, 86 NY2d 591.) II. Under New York and federal law, the trial court was required to permit the defense to use statements on cross-examination of police witnesses for the limited nonhearsay purpose, held proper in *Kyles v Whitley* (514 US 419 [1995]), of challenging the adequacy of their investigation into the main disputed factual issue of whether the complainant had the knife. (*People v Gissendanner*, 48 NY2d 543; *Davis v Alaska*, 415 US 308; *People v Hudy*, 73 NY2d 40; *People v Knight*, 80 NY2d 845; *People v Cade*, 73 NY2d 904; *People v Schwartzman*, 24 NY2d 241; *People v Corby*, 6 NY3d 231; *Olden v Kentucky*, 488 US 227; *Delaware v Van Arsdall*, 475 US 673; *People v McDowell*, 9 NY2d 12.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Gina Mignola* and *AmyJane Rettew* of counsel), for respondent. The trial judge properly handled the issues raised by comments one officer overheard from the crowd while guarding crime scene blood evidence from contamination. (*Youngblood v West Virginia*, 547 US 867; *People v Hilts*, 13 NY3d 895; *People v Rodriguez*, 100 NY2d 30; *Brady v Maryland*, 373 US 83; *People v Colon*, 13 NY3d 343; *People v Fuentes*, 12 NY3d 259; *People v Hunter*, 11 NY3d 1; *People v Garcia*, 46 AD3d 461; *DiSimone v Phillips*, 461 F3d 181; *United States v Rivas*, 377 F3d 195.)

**OPINION OF THE COURT**

JONES, J.

This appeal presents two issues for our review. First, whether the failure of the police to interview witnesses after overhearing two potentially exculpatory statements constituted a *Brady* violation. Second, whether defendant was improperly precluded during cross-examination from challenging the adequacy of the police investigation.

## I

It is undisputed that in the early morning of August 8, 2004, Charles Shell and 10 friends attended the 1:00 A.M. showing of a movie in a Times Square theater. In the crowded theater—a two-level auditorium with a capacity for approximately 578 people—Shell and his friends were loudly talking during the

early portions of the movie when someone shouted at them to be quiet. At this point, the versions of the salient facts diverge.

According to the People, when Shell looked away from the movie, he observed his friends out of their seats and facing a group of approximately 10 people standing on the balcony level of the theater. The group, which included defendant Kenneth Hayes, descended from the balcony level. Shell and his friends left their seats to approach the group and observed defendant pacing back and forth in a "rocking motion," saying "Who want it?" When Shell confronted defendant, defendant grabbed Shell's left wrist, blocked his right arm, punched Shell twice in the stomach, and fled from the theater. Shell realized that he had been, in fact, stabbed when he observed blood on his shirt.

Defendant claims that he went to the lower level of the theater to politely ask Shell and his friends to refrain from talking during the movie. After he made the request, Shell leapt from his seat and confronted defendant, making a gesture with respect to his belt—an indication to defendant that Shell had a weapon. Shell removed a knife from his waistband and swung at defendant with his left arm. Defendant used his left hand to grab Shell's arm and his right hand to wrest the knife away. During the course of the altercation, defendant was pushed onto the stairs leading up to the balcony of the theater. While he was on the ground, leaning on the stairs with possession of the knife, defendant attempted to block a further punch, but the forward momentum of Shell resulted in him being stabbed. Defendant fled the theater to escape an alleged chase by Shell's friends.

Ultimately, defendant was apprehended outside of the movie theater by Sergeant Mack who had observed him fighting within the vestibule of the theater and throwing a metal object into the street—later recovered and identified as a gravity knife. After the arrest, in the midst of a hectic setting, Sergeant Mack then assigned officers to either secure the crime scene, control the crowd, gather evidence, or interview possible witnesses.

Sergeant Fitzpatrick was tasked with safeguarding the crime scene to prevent contamination of blood evidence. While guarding the location, Sergeant Fitzpatrick overheard two separate individuals claim, "That's the guy [referring to Shell], . . . he had the knife first, he got it taken away from him, he got what he deserved" and "That guy [Shell] pulled the knife out first, the other guy took it away from him." Sergeant Fitzpatrick did

not ascertain the identities of the potential witnesses, obtain contact information, or otherwise investigate these two statements.

During trial preparation, Sergeant Fitzpatrick disclosed these two statements to the prosecution, and the People immediately advised defendant of this newfound information. Defendant argued before the trial court that the lack of police investigation of the two statements and the failure to obtain contact information constituted a *Brady* violation. Defendant also sought to use the statements for the nonhearsay purpose of challenging the completeness of the police investigation. The trial court ruled that no *Brady* violation was committed by the People and precluded defense counsel, during the cross-examination of Sergeant Fitzpatrick, from eliciting testimony regarding the two statements. After a jury trial, defendant was acquitted of first degree assault, but convicted of second degree assault and weapon possession.

In a 3-2 decision, the Appellate Division affirmed the judgment, holding that the People did not violate their disclosure obligations under *Brady* and had no duty to obtain the identities or contact information of the bystanders (72 AD3d 441, 441-442 [1st Dept 2010]). Furthermore, the Appellate Division held that the trial court properly exercised its discretion in limiting defendant's cross-examination for the purpose of challenging the thoroughness of the police investigation (*id.* at 442). A Judge of this Court granted defendant leave to appeal (15 NY3d 751), and we now affirm.

## II

In the seminal case *Brady v Maryland* (373 US 83, 87 [1963]), the United States Supreme Court held that a criminal defendant's right to due process is violated when the prosecution suppresses favorable evidence that is material to guilt because every criminal defendant should "be afforded a meaningful opportunity to present a complete defense" (*California v Trombetta*, 467 US 479, 485 [1984]). "To establish a *Brady* violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (*People v Fuentes*, 12 NY3d 259, 263 [2009]; *see also Strickler v Greene*, 527 US 263, 281-282 [1999]).

■ Here, defendant claims that the police and the People committed a *Brady* violation by failing to interview, or at a

minimum, acquire the contact information of the two individuals who made the statements overheard by Sergeant Fitzpatrick. While defendant's argument is couched in *Brady* terms, when distilled, he essentially seeks a rule that would impose an affirmative duty upon the police to obtain potentially exculpatory evidence for the benefit of a criminal defendant. However, this Court has declined to impose such an obligation.

In *People v Alvarez* (70 NY2d 375 [1987]), the defendant, charged with various Vehicle and Traffic Law offenses for intoxicated driving, asked this Court to require the police to obtain and preserve additional breath samples for later testing because the initial samples were destroyed when tested by the police. We concluded that there is no "basis for a rule, sought by defendants in this case, that would require the police to affirmatively gather evidence for the accused" (*Alvarez*, 70 NY2d at 381). And in *People v Reedy* (70 NY2d 826, 827 [1987]), where the defendant sought a copy of a personal account written by the victim of an attempted rape, we held, among other things, that the People had no obligation to disclose evidence "not in their possession or control." In addition, the Supreme Court has similarly noted that it is "[l]ess clear from our access-to-evidence cases the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession" (*Trombetta*, 467 US at 486).

While this Court has instructed that "[a] necessary corollary of the duty to disclose is the obligation to preserve evidence until a request for disclosure is made" (*People v Kelly*, 62 NY2d 516, 520 [1984]), defendant erroneously equates the word "preserve" with "obtain" or "acquire." There is a difference between preserving evidence already within the possession of the prosecution and the entirely distinct obligation of affirmatively obtaining evidence for the benefit of a criminal defendant. The protection of *Brady* extends to "discoverable evidence gathered by the prosecution" (*Kelly*, 62 NY2d at 520) and seeks to ensure the disclosure, or prevent the destruction of exculpatory information already within the People's possession (*see e.g. Kelly*, 62 NY2d at 520 [in a larceny and criminal possession of property case, the Court found a *Brady* violation when the police permanently lost property *within their possession*]; *People v Cortijo*, 70 NY2d 868 [1987] [Court held no *Brady* violation occurred where the defendant had an opportunity to

use the allegedly exculpatory information at trial, but the People are only required to disclose exculpatory material information in their control]; *People v Brown*, 67 NY2d 555, 559 [1986] ["(T)he People unquestionably have a duty to disclose exculpatory material in their control"]). Here, the People met their obligation under *Brady* when they disclosed the statements to defendant; the prosecution was not required to impart identifying information unknown to them and not within their possession.

The recent federal case of *United States v Rodriguez* (496 F3d 221 [2d Cir 2007]) is illustrative. There, the defendant sought to compel production of any notes created by the government during their investigation of witnesses. The government claimed that no notes were created memorializing the interviews, and the defendant responded that this constituted a *Brady* violation. The Second Circuit held that while exculpatory information that had been procured must be disclosed, the government investigators had no affirmative obligation to create notes for the benefit of the defendant (*id.* at 224-225). Here, similarly, while the People fulfilled their duty by apprising defendant of the content and substance of the statements, they had no responsibility to acquire the contact information of the makers of the statements.

Accordingly, we adhere to our precedent, decline to impose an affirmative obligation upon the police to obtain exculpatory information for criminal defendants, and hold that the failure of the police and the People to investigate the sources of the two statements was not a *Brady* violation.

### III

Defendant additionally argues that he was improperly precluded from utilizing the two statements and challenging the thoroughness of the police investigation pursuant to *Kyles v Whitley* (514 US 419 [1995]). Defendant's argument is unavailing.

In *Kyles*, the Supreme Court, discussing the materiality under *Brady* of witness statements that were not disclosed, acknowledged that it is a common and accepted tactic for defendants to challenge the adequacy of a police investigation. There, during the investigation of a murder, the police relied upon an informant named "Beanie." Although Beanie should have been considered a suspect, the police failed to question and investigate him, instead relying on him despite his "eager[ness] to cast

suspicion on Kyles" (*id.* at 425), as evidenced by an internally inconsistent, and continuously evolving narrative of the incident. The Supreme Court reasoned that "the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt" (*id.* at 446). If this line of inquiry were pursued, "the defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence" (*id.* at 447).

Despite this recognized strategy, a criminal defendant does not have an unfettered right to challenge the adequacy of a police investigation by any means available. It is well settled that "[a]n accused's right to cross-examine witnesses . . . is not absolute" (*People v Williams*, 81 NY2d 303, 313 [1993]). The scope of cross-examination is within the sound discretion of the trial court (*see People v Corby*, 6 NY3d 231, 233 [2005]) and it must "weigh the probative value of such evidence against the possibility that it 'would confuse the main issue and mislead the jury . . . or create substantial danger of undue prejudice to one of the parties' " (*id.* at 234; *see People v Davis*, 43 NY2d 17, 27 [1977]).

Defendant contends that the statements were germane to his justification defense because it established that Shell was the initial aggressor and possessed the knife first. Based on that premise, defendant sought to utilize the statements and argue that the investigation was inadequate because the police: (1) failed to fingerprint the knife, and (2) failed to interview, or obtain the contact information of the two individuals who made the statements.

█ While a defendant has a constitutional right to present a defense, "[t]he right to present a defense 'does not give criminal defendants carte blanche to circumvent the rules of evidence' " (*People v Cepeda*, 208 AD2d 364, 364 [1st Dept 1994], quoting *United States v Almonte*, 956 F2d 27, 30 [2d Cir 1992]). Challenging the adequacy of a police investigation may constitute a permissible nonhearsay purpose where appropriate, but there is no rule requiring the automatic admission of any hearsay statement (*see Buie v Phillips*, 298 Fed Appx 63, 66 [2d Cir 2008] [there is no "unfettered right to introduction of hearsay testimony bearing no assurance of reliability"]). Here, the trial court did not abuse its discretion in concluding that the use of the anonymous hearsay in cross-examination would have created an unacceptable risk that the jury would consider the statements for their truth.

Furthermore, the hearsay statements were not so critical that their exclusion deprived defendant of due process (*cf. Chambers v Mississippi*, 410 US 284 [1973]). Penal Law § 35.15 (2) (a) provides that deadly physical force may not be used unless:

"(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating."

Despite the conflicting accounts of the incident in question, it is undisputed that at a certain point during the altercation, defendant came into possession of a knife and Shell was unarmed. Defendant's justification defense must be viewed at this focal point and the true, crucial inquiry is whether defendant was justified in the use of deadly physical force against an unarmed Shell (*see People v Aska*, 91 NY2d 979, 981 [1998]). Even accounting for the claim that Shell continued to struggle with, and swing at defendant, Shell was no longer capable of using deadly physical force against defendant. Therefore, the relevancy of the statements is diminished because the question of whether the knife was initially possessed by Shell is not decisive of the issue of defendant's justified use of deadly physical force at the time of the alleged stabbing. As such, the two statements that Shell initially possessed the knife did not have the great probative force anticipated by defendant.

For the foregoing reasons, we hold that the trial court did not abuse its discretion in prohibiting the use of the hearsay statements and precluding defendant from challenging the adequacy and thoroughness of the police investigation where the probative force of the proposed evidence was outweighed by the dangers of speculation, confusion, and prejudice (*see generally Davis*, 43 NY2d at 27).

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). I agree that the apparent failure of the police to collect contact information respecting the putative witnesses overheard by Sergeant Fitzpatrick was not a due process violation sanctionable under *Brady v Maryland* (373 US 83 [1963]); this was not a case in which information favorable to the accused in the possession or control of the

prosecution was suppressed and, accordingly, *Brady* does not come into play (*see id.* at 87). It does not follow, however, and I do not agree, that defendant was properly precluded from using the statements overheard by Fitzpatrick to question the adequacy of the investigation upon which his prosecution was premised.

In analyzing this second point, the majority first acknowledges that the admission of out-of-court statements for the purpose of showing that the police were aware of, yet failed to pursue, information potentially exculpatory to the accused, is not barred by the hearsay rule—indeed, that the defense tactic of relying upon such statements is "common and accepted" (majority op at 52, citing *Kyles v Whitley*, 514 US 419, 446-447 [1995]). The majority, however, concludes that the trial court did not abuse its discretion in excluding the statements at issue because their probative value was outweighed by their potential to engender "speculation, confusion, and prejudice" (majority op at 54). This analysis is, in my view, flawed, principally because the record does not disclose that there was any exercise of discretion involved in the trial court's decision to deny defendant use of the bystander statements, but also because the exercise of discretion now described by the majority is not consistent with a defendant's basic right to present a defense.

The trial court excluded the proffered bystander statements simply as hearsay, stating at the time of its ruling, "I decide whether [the statement] comes in under the rules of evidence. And if I rule that you're bringing it out for an impermissible purpose and it's hearsay, it doesn't come out" (Appellant's Appendix at A401). This was nothing more than an erroneous application of the hearsay rule—a legal error—arising from the court's misunderstanding of the rule and the purpose for which the statements were proposed to be introduced. It should be corrected as such; there is absolutely no indication that the court, although recognizing that there was no legal bar to the statements' admission, nevertheless determined that they should not be received because, after performing a discretionary balancing of the sort the majority now retrospectively imputes, it had concluded they would likely mislead the jury.

But, even if some discretionary exercise had been involved, it would have been an abuse of discretion to deny defendant the limited use of the statements sought. The statements were facially indicative of the existence of independent witnesses whose accounts of the altercation agreed with defendant's in crucial respects and were supportive of his claim that his

conduct was justified. While, because of the cited police omission, the reliability of the statements could not be tested, there was, as noted, no hearsay bar to their admission precisely to show that an investigative lapse had occurred leaving room for reasonable doubt as to the adequacy of the evidence offered by the People to meet their burden of disproving the defense of justification (*see* Penal Law § 35.00; *Matter of Y.K.*, 87 NY2d 430, 433 [1996]). The use of the statements for this legally permissible purpose would, of course, have been accompanied by appropriate limiting instructions, and as we have frequently noted, it is presumed that such instructions are heeded (*see e.g. People v Tosca*, 98 NY2d 660 [2002]).[1] Moreover, the People would have been afforded the opportunity to respond with evidence showing that their investigation was in fact suitably thorough.[2]

The discretionary preclusion of defendant's use of the statements on cross-examination would, under these circumstances, have been insupportable since a trial court has no discretion to cut off a legally permissible, non-collateral, indeed potentially exculpatory, line of inquiry by a criminal defendant. Such discretion would be utterly incompatible with the constitutional right to present a defense (*see People v Carroll*, 95 NY2d 375, 385-386 [2000]; *People v Hudy*, 73 NY2d 40, 57 [1988], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]; *see also Chambers v Mississippi*, 410 US 284, 294 [1973] ["The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations"]). It is no answer to say, as the majority does, that the relevancy of the statements at issue is "diminished" (majority op at 54) because it is undisputed that at the time of the stabbing defendant possessed the knife. If the stabbing occurred under the circumstances described by defendant—as an incident

---

1. While the majority alludes to some discretionary exercise in which the trial court concluded that there was an unacceptable risk that the bystander statements would be considered for their truth, there is no evidence of any such exercise or conclusion in the record. Nor is it explained how such a conclusion in this case would be reconciled with the presumption, most frequently invoked by the prosecution, that limiting instructions are abided.

2. The People, for example, maintain that although Officer Fitzpatrick did not record the contact information of the declarant bystanders, there were numerous other officers on the scene assigned to interview witnesses and that, if the declarants' contact information was not obtained, it was probably because, after the declarants were interviewed, it was determined that they had no first-hand information.

of defendant's disarming of the initial aggressor at close quarters—it is plain that defendant's possession of the knife at the moment of the stabbing, and the concomitant circumstance that Shell was then unarmed, would not have been preclusive of a finding of justification (*see e.g. People v Huntley*, 59 NY2d 868, 869 [1983], *affg* 87 AD2d 488, 491 [4th Dept 1982]).

Accordingly, while due process was not violated by the State's apparent failure to develop leads seemingly favorable to defendant, it was violated by the court's failure to permit defendant to bring what were evidently highly material inadequacies in the State's investigation to the factfinder's attention. The State in our adversary system of justice has no affirmative duty to seek out evidence favorable to the accused, but when its failure to do so may reasonably be understood to impair the adequacy of the proof of guilt, judicial discretion is not properly deployed to shield the alleged infirmity from the jury's scrutiny.

Judges CIPARICK, GRAFFEO, READ, SMITH and PIGOTT concur with Judge JONES; Chief Judge LIPPMAN dissents in a separate opinion.

Order affirmed.