OPINION OF THE COURT
Sweeny, J.
Does the failure of the police to administer a physical coordination test to a non-English speaking defendant of Hispanic origin arrested for driving while intoxicated violate equal protection and due process, where such tests are routinely administered to English-speaking defendants? For the reasons stated herein, we hold that it does not.
On June 26, 2007, at approximately 10:55 p.m., Police Officer Miguel Iglesias observed a 1992 Toyota Camry parked partially on the sidewalk facing oncoming traffic on Pugsley Avenue in the Bronx. Upon approaching the vehicle, Iglesias noticed the driver’s side front tire was blown out. He saw defendant in the driver’s seat, “slouched” over the steering wheel. Iglesias knocked on the driver’s side window to get defendant’s attention. When the door opened, Iglesias smelled a strong odor of alcohol coming from the vehicle and saw an open 40-ounce bottle of beer in the car. The keys were in the ignition, the motor was running and the dashboard lights were on. Iglesias asked defendant to step out of the car. Defendant was unable to do so by himself and had to be assisted by Iglesias. Officer Iglesias testified that defendant was unsteady on his feet, had bloodshot eyes, and appeared to be intoxicated. Iglesias asked defendant basic questions such as his name and address. Defendant began speaking in Spanish. Iglesias then asked defendant, in Spanish, if he was drunk and defendant replied, also in Spanish, “Yes, I am drunk. That’s why I parked over here.” At that point, Officer Iglesias placed defendant under arrest.
Police Officer Angel Padilla responded to the scene to transport defendant to the 45th Precinct for a breathalyzer test. Padilla testified that defendant was unsteady on his feet, needed help to walk to the police van and had bloodshot eyes with dilated pupils, and that his breath smelled strongly of alcohol. After arriving at the 45th Precinct, Officer John King, the breathalyzer operator, told defendant why he was under arrest and asked if he wanted to take the breathalyzer test. Upon realizing there was a “language barrier,” King read the information and question regarding the breathalyzer test in English and then played a Spanish-language tape that repeated the information and question. After watching the tape, defendant agreed to *8 take the test. Officer Padilla assisted Officer King in explaining to defendant in Spanish the procedure required to take the test. The test results indicated that defendant’s blood alcohol content was .21%, nearly three times the legal limit.
Officer King, who had been specially trained to administer the standard physical coordination test and analyze the result, testified that he did not give that test to defendant because he did not speak English. He explained that, although Officer Padilla assisted him with the breathalyzer test, he did not want Padilla to translate the coordination test instructions since “[p]art of the test is following directions. There’s subtle parts of the test and I wouldn’t know if the officer truly and accurately described what I was saying” or whether Padilla was “using his own words or translating exactly what I said.” Officer King also testified that the Police Department does not have a Spanish language tape of the coordination test instructions.
After a juiy trial, defendant was found guilty of driving while intoxicated. Thereafter, defendant moved to set aside the verdict on the ground that the New York City Police Department policy of administering both breathalyzer and physical coordination tests to English-speaking DWI suspects while offering only the breathalyzer test to non-English speakers violated the Equal Protection and Due Process Clauses of the United States and New York Constitutions.[1]
The trial court granted defendant’s motion, set aside the verdict and dismissed all charges. The court found that the procedure employed by the Police Department created a “classification predicated upon a person’s Hispanic origin and their inability to speak and/or understand the English language and therefore discriminates against primarily Spanish speaking individuals of Hispanic origin” and thus, violated the Equal Protection Clause under either a strict or rational basis analysis.
The court also found a due process violation, finding the procedures utilized deprived defendant of his liberty interest and that this deprivation could be eliminated by “additional or substitute procedures,” i.e., by providing interpreters for non-English speaking suspects. It rejected the People’s argument that such procedures would be cost prohibitive.
*9 Much of the court’s rationale is similar to its reasoning in a prior published decision (People v Molina, 25 Misc 3d 362 [Sup Ct, Bronx County 2009]). We now reject that rationale and find the court erred in concluding that defendant’s constitutional rights to equal protection of the law and due process were violated by the Police Department practice under consideration.
The Equal Protection Claim
Section one of the Fourteenth Amendment to the United States Constitution provides that “[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws.” The Equal Protection Clause protects against “intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents” (Village of Willowbrook v Olech, 528 US 562, 564 [2000]). Article I, § 11 of the New York State Constitution provides New York citizens with an equivalent constitutional safeguard (see Hernandez v Robles, 7 NY3d 338, 362 [2006]).
Claimed violations of equal protection are evaluated under either a “strict scrutiny” or “rational basis” analysis. Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be strictly scrutinized and will be upheld only if the government can establish a compelling justification for the action (see Regents of Univ. of Cal. v Bakke, 438 US 265, 299-300 [1978]; San Antonio Independent School Dist. v Rodriguez, 411 US 1, 16-17 [1973]). Where a suspect class or a fundamental right is not implicated, the action need only be rationally related to a legitimate governmental purpose (see Massachusetts Bd. of Retirement v Murgia, 427 US 307, 312 [1976]).
When these fundamental analytical principles are applied to the facts of this case, the trial court’s determination that the practice at issue disadvantaged a suspect class, triggering the strict scrutiny that requires the government to establish a compelling justification for the practice (Bakke, 438 US at 299; Rodriguez, 411 US at 16-17) cannot stand.
Although Hispanics as an ethnic group constitute a suspect class under equal protection analysis (see Keyes v School Dist. No. 1, Denver, 413 US 189, 197 [1973]), the practice at issue here is facially neutral as to ethnicity. The policy determination as to whether or not to perform physical coordination tests is based on a suspect’s ability to speak and understand English, *10 and is not based upon race, religion or national origin. It has long been the rule that “[l]anguage, by itself, does not identify members of a suspect class” (Soberal-Perez v Heckler, 717 F2d 36, 41 [2d Cir 1983], cert denied 466 US 929 [1984]).
The facial neutrality of the classification, however, does not prevent defendant from demonstrating intentional discrimination, either in the general policy or, as in this particular case, based on Hispanic ethnicity. “[S]uch a claim requires that a [defendant] show an intent to discriminate against the suspect class.” In order to establish intentional discrimination, defendant must show that “the decision maker . . . selected or reaffirmed a particular course of action at least in part ‘because of not merely ‘in spite of its adverse effects upon an identifiable group.” (Soberal-Perez v Heckler, 717 F2d at 42.) Thus, while a practice that is facially neutral as to a suspect classification does not insulate it from a finding of discrimination against a suspect class, an equal protection claim can only be established by a demonstration of actual intentional discrimination. Otherwise, the claim must be evaluated under the rational basis analysis.
Significantly, there is nothing in the record to support the trial court’s rejection of the police officer’s explanation of the policy, as well as its conclusion that the police chose not to administer a coordination test on the basis of anti-Hispanic animus. On the contrary, the only evidence adduced here shows that non-English-speaking suspects are not offered the option of taking a physical coordination test, in order to avoid confusion and complications due to a language barrier. Other courts that have addressed this issue have accepted this rationale (see People v Perez, 27 Misc 3d 880, 885 [Sup Ct, Bronx County 2010]; People v Burnet, 24 Misc 3d 292, 300-301 [Sup Ct, Bronx County 2009]) as we now do.
Accordingly, since the practice at issue does not burden a suspect class, and intentional discrimination based on ethnicity was not demonstrated, we evaluate defendant’s claim under the rational basis analysis (see Murgia, 427 US at 312) instead of the more stringent strict scrutiny analysis.
To establish an equal protection violation under the rational basis analysis, a claimant must show that the governmental action in question does not bear a rational relationship to a legitimate government purpose (see id.). Based upon the evidence before us, we conclude that such a rational basis for the policy does exist.
*11 The police, of course, clearly have an interest in the reliability of coordination tests. The evidence supports the conclusion that conducting the test through a Spanish-speaking police officer who was not trained in conducting the test could compromise the reliability of the result. Furthermore, there was evidence in the record, similar to the testimony presented in People v Perez (27 Misc 3d at 886-887), that it is inherently impracticable to conduct coordination tests through interpreters. While the failure to provide interpreters in judicial or administrative proceedings may give rise to equal protection and due process claims (see e.g. People v Ramos, 26 NY2d 272, 274 [1970]; People v Robles, 203 AD2d 172, 173 [1st Dept 1994], revd, on other grounds 86 NY2d 763 [1995]), we note that sobriety coordination tests are merely investigative techniques and are neither judicial nor administrative actions (see id.; see also People v Burnet, 24 Misc 3d at 301). Indeed, a defendant’s right to an interpreter is available “only at or after the time that adversary judicial proceedings have been initiated against [defendant]” (People v Pelegrin, 39 Misc 3d 788, 797-798 [Crim Ct, Bronx County 2013], quoting Kirby v Illinois, 406 US 682, 688 [1972]). To require the Police Department to have qualified interpreters on call on a 24/7 basis would impose unrealistic and substantial financial and administrative burdens.[2] The avoidance of these crushing obligations provides a rational basis for the policy. This conclusion is not undermined by the fact that the Police Department sometimes uses bilingual officers as ad hoc interpreters for other purposes, such as reading a suspect his or her Miranda rights, as occurred in this case. Additionally, the time it would take an interpreter to get to a testing site would serve to degrade evidence, as the passage of time impacts sobriety. To require the Police Department to implement such a policy would be tantamount to substituting our judgment for that of the agency. Such policy making is not the function of the courts. When we *12 are called upon to review the actions of coordinate branches of government, “we do so to protect rights, not to make policy” (Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14, 28 [2006]). As we have previously noted, the courts should not “substitute their judgment for the discretionary management of public business by public officials,” as the courts have not been lawfully charged with that responsibility (Roberts v Health & Hosps. Corp., 87 AD3d 311, 326 [2011], lv denied 17 NY3d 717 [2011], citing Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 232 [2007]; Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992 [1976]).
As the policy in question does not violate the Equal Protection Clauses of the Federal and New York State Constitutions, defendant’s arguments must fail.
The Due Process Claim
The due process claim, as framed by defendant, is not whether it is unconstitutional to conduct a physical coordination test for one group of suspects and not another, but whether it is unconstitutional to deprive any suspect of such a test.
Before we begin our analysis of defendant’s due process claim, we must consider the nature of the physical coordination test. As stated, the coordination test is merely an investigative tool used to gather evidence. Defendant argues that such a test may have provided evidence favorable to his defense and, thus, the failure of the police to give him the opportunity to obtain potentially favorable evidence violates his due process rights.
This argument is specious at best. We are not faced with a situation where the police failed to disclose or preserve evidence (see People v Kelly, 62 NY2d 516, 520 [1984]). This defendant “erroneously equates the word ‘preserve’ with ‘obtain’ or ‘acquire.’ There is a difference between preserving evidence already within the possession of the prosecution and the entirely distinct obligation of affirmatively obtaining evidence for the benefit of a criminal defendant.” (People v Hayes, 17 NY3d 46, 51 [2011], cert denied 565 US —; 132 S Ct 844 [2011].) It is the settled law of this state “that the police have no affirmative duty to gather or help gather evidence for an accused” (People v Finnegan, 85 NY2d 53, 58 [1995], cert denied 516 US 919 [1995]; see also People v Alvarez, 70 NY2d 375, 381 [1987]; People v Hayes, 17 NY3d at 52). These precedents need to be considered in evaluating defendant’s due process claim, since we must be mindful of the flexible nature of due process that calls for “such *13 procedural protections as the particular situation demands” (Mathews v Eldridge, 424 US 319, 334 [1976]).
In evaluating defendant’s due process claim, we use the three-factor balancing test set forth in Mathews-.
“the private interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail” (424 US at 335).
Applying these principles to this case, we conclude that a DWI suspect does not have a due process right to compel the police to administer a coordination test.
While, as in any criminal case, a significant liberty interest is at stake, defendant has failed to show that the policy at issue presents a great risk that he will be erroneously deprived of his liberty. As noted in our discussion of defendant’s equal protection claim, unlike judicial or extrajudicial proceedings, where it is essential that defendants who do not speak sufficient English be provided with qualified interpreters in order to meet due process standards, “the investigation of suspected intoxicated driving by the police, in the field or at the intoxicated driver testing facility, is not a judicial, quasi-judicial or even an administrative proceeding.” (People v Perez, 27 Misc 3d at 887-888.) This is particularly true where, as here, defendant’s breathalyzer test results, as well as the officer’s observations of defendant at the scene of his arrest, amply supported the conclusion that defendant was, in fact, intoxicated.
Since, as noted, there is no authority that a defendant has the right to have the police perform certain investigative functions simply because they may yield information that is helpful to him (People v Hayes, 17 NY3d at 52]), there is no risk of an erroneous deprivation of defendant’s liberty interest by failing to conduct a physical coordination test.
Although addressed in the context of defendant’s equal protection claim, it bears repeating in the context of his due process claim that the probable value of substitute procedural safeguards, i.e., to require the New York City Police Department to have trained interpreters in numerous languages available *14 around the clock on short notice, would result in enormous fiscal and administrative burdens on the Police Department. These impacts are legitimate concerns of the government. Defendant has made no showing and has failed to cite any precedent to support his proposition that he has a right to a pre-arrest translator or that the failure to provide non-English speakers with a physical coordination test violates either equal protection or due process.
The Mathews analysis clearly demonstrates that defendant’s due process claims, as with the equal protection claims, are without merit.
Accordingly, the order of the Supreme Court, Bronx County (Caesar D. Cirigliano, J.), entered on or about February 8, 2012, which granted defendant’s CPL 330.30 (1) motion to set aside a verdict convicting him of driving while intoxicated, should be unanimously reversed, on the law, the verdict reinstated, and the matter remanded for sentencing.
Tom, J.E, Friedman and Feinman, JJ., concur.
Order, Supreme Court, Bronx County, entered on or about February 8, 2012, reversed, on the law, the verdict reinstated, and the matter remanded for sentencing.

. The record reflects that defense counsel raised this issue both at the pretrial hearing and in the context of his motion to dismiss at the close of the evidence.

. The New York State Unified Court System’s Annual Report for 2007 (available at http://www.nycourts.gov/reports/annual/pdfs/2007AnnualReport.pdf) identified 170 distinct languages spoken in New York courts. That same report identified the pay scale for qualified interpreters at $250 per diem, and $140 for half a day. The Weissman Center for International Business at Baruch College compiles statistical data on various aspects of New York City life and has identified over 38 different language groups spoken by New Yorkers as of 2011, the latest year for which estimates were available (NYC Data, Population and Geography, New York City [NYC] Spoken Languages and Ancestry, Population 5 Years and Over [Table 2.I.J.], available at http:// www.baruch.cuny.edu/nycdata/population-geography/language-ancestry.htm).