This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 186
The People &c.,
           Respondent,
        v.
Jose Aviles,
           Appellant.

           Aleksandr B. Livshits, for appellant.
           Stanley R. Kaplan, for respondent.
           Make the Road New York, amicus curiae.

GARCIA, J.:

          The New York City Police Department does not administer

physical coordination tests when a language barrier prevents the

administering officer from communicating the test instructions to

a non-English speaking suspect.  Defendant Jose Aviles challenges

this policy, arguing that his equal protection and due process

- 1 -

rights were violated because he was denied a coordination test on the basis of a language barrier. We disagree, and hold that the order of the Appellate Term should be affirmed.

I.

*Factual Background*

Defendant was arrested after striking a marked New York City police vehicle that was entering traffic with its emergency lights on. According to the arresting officer, defendant had "a strong odor of alcohol on his breath," "slurred speech," and was "swaying and unsteady on his feet." At the scene of the accident, defendant made the following statement to the arresting officer: "I had a few Coronas about 15 minutes ago, about 3 Coronas."

After he was arrested, defendant was brought to an Intoxicated Driver Testing Unit (IDTU), where he consented to a breathalyzer test. The test, which was administered nearly three hours after the accident, resulted in a blood-alcohol content reading of 0.06 -- a reading below the 0.08 minimum required for a per se violation (Veh & Traf Law § 1192[2]). Defendant was not given a physical coordination test. Instead, the IDTU Technical Test Report contains a handwritten line crossing out the "Coordination Test" portion of the report, as well as a handwritten entry that reads: "No coord test given," and "Language Barrier." Defendant was ultimately charged with driving while impaired and driving while intoxicated (Veh & Traf

Law §§ 1192[1], [3]).

Defendant moved to dismiss the misdemeanor information on the ground that the NYPD violated his rights under the Equal Protection and Due Process clauses of the federal and state constitutions by failing to offer a physical coordination test on the basis of a language barrier. Specifically, defendant argued that, "while an English-speaking person arrested for driving under the influence of alcohol would ordinarily receive" a coordination test, defendant "was summarily denied this opportunity because of the language he speaks."[1] The People opposed, contending that defendant was not denied equal protection, and that defendant's due process rights were not implicated by the NYPD's decision not to offer a coordination test based on defendant's inability to speak or understand English.

Criminal Court granted defendant's motion, holding that the "failure to provide the defendant -- merely because he speaks only Spanish -- with access to [] potentially exculpatory evidence is a denial of his constitutional rights warranting dismissal." Specifically, the court determined that "the failure to administer the coordination test in this case constitutes a

---

[1] The dissent's discussion of persons who are "limited English proficient" or "LEP" was not raised before the trial court and, in any event, is inapplicable to this case. The trial court found -- and defendant has consistently maintained -- that he "speaks only Spanish, and not English."

denial of due process and equal protection" under both the United States Constitution and the New York State Constitution.  The Appellate Term reversed, holding that a similar constitutional challenge had recently been rejected by the Appellate Division (People v Aviles, 47 Misc 3d 126[A] [1st Dept App Term 2015], citing People v Salazar, 112 AD3d 5 [1st Dept 2013]).

A Judge of this Court granted defendant leave to appeal (25 NY3d 1198 [2015]).  We affirm.

II.

*Equal Protection*

Pursuant to the Fourteenth Amendment of the United States Constitution, "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws (US Const amend XIV, § 1).  The New York Constitution provides for equivalent equal protection safeguards (NY Const art I, § 11; see Hernandez v Robles, 7 NY3d 338, 362 [2006].

Alleged equal protection violations are primarily evaluated using either a "strict scrutiny" or a "rational basis" standard of review.  Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be subjected to "strict scrutiny," and will be upheld only if the government can establish a compelling justification for the action (Regents of Univ. of Cal. v Bakke, 438 US 265, 299-300 [1973]).  While "facially neutral conduct can constitute

discrimination" against a suspect class in violation of equal protection, such a claim "requires that a plaintiff show an intent to discriminate against the suspect class" (Soberal-Perez v Heckler, 717 F2d 36, 42 [2d Cir 1983]).  Where a suspect class or fundamental right is not implicated, the government action need only be rationally related to a legitimate governmental purpose (id. at 41).

Here, defendant's equal protection claim is premised on the notion that the NYPD's policy of offering physical coordination tests only in English amounts to intentional discrimination on the basis of ethnicity or national origin.  But strict scrutiny is inapplicable to defendant's claim, as he has not demonstrated that the challenged policy singles out members of a suspect class, nor has he shown intentional discrimination. While Hispanics as an ethnic group constitute a suspect class (Keyes v School Dist. No. 1, Denver, 413 US 189, 197 [1973]), the NYPD policy at issue is facially neutral and is not based on race, ethnicity, or national origin.  Rather, the policy is based solely on a suspect's ability to speak and understand English, which, by itself, does not implicate a suspect class (Soberal-Perez, 717 F2d at 41).  Nor has defendant demonstrated intentional discrimination based on his ethnicity.  To the contrary, the record demonstrates that the officer's decision not to conduct a coordination test was based solely on a determination that a language barrier -- not defendant's

ethnicity -- prevented the officer from administering the test.

The dissent contends that, where language "serve[s] as a proxy for national origin, ethnicity, and race," a defendant could establish intentional discrimination against a suspect class sufficient to invoke strict scrutiny (dissenting op at 5-8). We agree. To be sure, upholding the facial validity of the NYPD policy does not preclude all challenges to the policy as applied to a particular defendant where, for instance, the defendant was denied a coordination test on the basis of his ethnicity, as opposed to any language barrier. But that is not the case before us. The instant case presents no evidence of such intentional discrimination or other similarly compelling circumstances. Nor is there any indication that defendant's language was "treated as a surrogate" for his ethnicity or was a mere "pretext for racial discrimination" (Hernandez v New York, 500 US 352, 371-372 [1991]). Rather, defendant has consistently maintained that, as a non-English speaker, he "was summarily denied this opportunity because of *the language he speaks*" (emphasis added). The record supports the notion that the decision not to administer a coordination test was a purely language-based determination -- not a determination based on race, ethnicity, or national origin. Accordingly, rational basis review, rather than strict scrutiny, applies to defendant's equal protection claim.

The challenged policy withstands rational basis review.

Both the NYPD and the public have a substantial interest in ensuring the reliability of coordination tests, and the clarity of the instructions is crucial to the reliability of the results. Indeed, the record makes clear that coordination tests are designed not only to assess a suspect's "motor skills in completing the specific tasks," but also to evaluate the suspect's "capacity to [] follow instructions."  But coordination tests are uniquely ill-suited for administration via translation; they are generally lengthy -- containing thirty lines of instructions -- and require contemporaneous demonstration and explanation of the tasks to be performed.  The translation of instructions cannot be delegated to a translator, as the administering officer must have the requisite training and experience, and must be able to understand the translated instructions in order to accurately analyze the suspect's responses.  Moreover, given the time-sensitive nature of coordination tests, requiring an administering officer to seek out an appropriately trained translator could result in a delay that affects the results (see Missouri v McNeely, 133 S Ct 1552, 1560 [2013] [noting that, "as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated"]).  Indeed, the value of physical coordination tests diminishes with the passage of time, and test results eventually become entirely

meaningless where they follow a prolonged delay.  Nor can instructions "simply be recited through a video tape," as the tests require "specific clarity in instructions and interactions."  The NYPD policy therefore rationally furthers the goals of avoiding delayed or erroneous results due to a language barrier.

In addition, the NYPD undoubtedly has a substantial interest in avoiding the heavy financial and administrative burdens of employing translation services or multilingual officers qualified to administer coordination tests in the myriad languages spoken in this State.  According to the record, New York State residents speak 168 distinct languages and countless dialects.  Requiring the administration of translated instructions to all intoxicated driving suspects statewide would impose an exorbitant cost that would have a "crippling impact" on the State, as detailed in the record.  The dissent's contention that "the NYPD has language access protocols in place and resources available to address the needs of New York City's linguistically diverse communities" (dissenting op at 1-2) is unsupported by the record and ignores the realities of physical coordination tests, which require precise instructions and prompt administration.[2]  Nor does the dissent identify which particular

---

[2] The dissent exempts defendant from the preservation rule and opts to "take judicial notice" of "publicly-available documents" in order to bolster arguments that defendant asserts for the first time on appeal (dissenting op at 10). We decline to

languages are "most often in demand" such that translation
services should be required (dissenting op at 11).

Each of the rationales established by the purportedly
"thin" record (dissenting op at 10) independently supplies a
legitimate government interest that is furthered by the NYPD
policy.  Of course, "New York City's commitment to access to
justice regardless of language status" is a laudable and worthy
goal (dissenting op at 2).   And the City's "recognition of the
needs of its diverse communities" is undoubtedly embodied in the
various Executive Branch letters, reports, and policies cited by
the dissent (dissenting op at 6-10).  But we do not measure
constitutional violations against these policies, nor do they
somehow give rise to an equal protection violation.  Under our
established constitutional analysis, we conclude that the
challenged NYPD policy is rationally related to a number of
legitimate governmental purposes.[3]

Accordingly, because the NYPD policy withstands
rational basis review, defendant's equal protection claim must be
rejected.

---

do the same.

[3] The dissent limits its analysis to the context of New York
City.  But our constitutional pronouncements apply statewide,
including to areas with dramatically different resources, law
enforcement practices, populations, and "linguistic needs"
(dissenting op at 11).  The dissent's analysis would call into
question investigatory tools employed by law enforcement
statewide.

### III.

*Due Process*

Under the United States Constitution, "[n]o person shall be . . . deprived of life, liberty or property without due process of law" (US Const amend V).  The New York Constitution provides for similar protections (NY Const art I, § 6) and "[w]e have at times found our Due Process Clause to be more protective of rights than its federal counterpart" (Hernandez, 7 NY3d at 362).  Due process is, of course, a flexible concept that calls for such procedural protections as the particular situation demands (Mathews v Eldridge, 424 US 319, 334 [1976]).  "Determining whether additional process is due in any particular proceeding requires balancing the interests of the State against the individual interest sought to be protected" (People v Ramos, 85 NY2d 678, 684 [1995], citing Mathews, 424 US at 334).

Defendant contends that the NYPD's failure to offer him a coordination test based on a language barrier violated his due process rights under the federal and state constitutions. However, as an initial matter, the police have no duty to assist a defendant in gathering evidence or establishing a defense (People v Finnegan, 85 NY2d 53, 57 [1995]).  Nor does a defendant have a right to have the police perform a certain investigative step simply because it may yield information that is helpful to him (Arizona v Youngblood, 488 US 51, 58-59 [1988]; People v Hayes, 17 NY3d 46, 51-52 [2011]).  And, while defendants have a

constitutional due process right to a qualified interpreter during judicial proceedings (People v Ramos, 26 NY2d 272, 274 [1970]), the same right is not implicated during the pre-arrest investigation of suspected intoxicated driving; the administration of coordination tests -- a discretionary, investigative technique designed to gather evidence of intoxication -- is not a judicial, quasi-judicial, or administrative proceeding.

In any event, as discussed above, the implicated State interests are substantial.  The State has a clear interest in avoiding the cumbersome and prohibitively expensive administrative and fiscal burdens of providing the requested translation services.  The State also has a strong interest in ensuring the accuracy of physical coordination tests, and the use of translated instructions -- either through qualified interpreters or through multilingual officers -- could compromise the test's reliability.  Given the substantial State interests involved, defendant's due process claim must be rejected.

IV.

Accordingly, the order of the Appellate Term should be affirmed.

People v Jose Aviles

No. 186

RIVERA, J.(dissenting):

Defendant Jose Aviles claims the New York Police Department violated his federal and state equal protection and due process rights when it denied him a physical coordination test based solely on his language skills. The People defend the NYPD policy of offering the coordination test to everyone except those persons who are perceived to be non-proficient in English[1] on the grounds that it ensures the reliability of the test and to

[1] For purposes of clarity and uniformity, I have adopted the parties' description of persons denied the coordination test as "non-English proficient" or "limited English proficient" (LEP). The Equal Access to Human Services provision of New York City's Human Rights Law defines a LEP person as "an individual who identifies as being, or is evidently, unable to communicate meaningfully with agency or agency contractor personnel because English is not [the individual's] primary language" (NYC Admin Code § 8-1002 [o]). Though the majority characterizes defendant as not being a LEP individual because of the nisi prius court's determination that he speaks "only Spanish, and not English" (maj op at 3, n 1), defendant clearly falls within New York City's understanding of a LEP individual.

- 1 -

do otherwise is administratively impracticable and burdensome.
These representations are inadequate to overcome a policy that
potentially places certain individuals in a better position than
others to defend against criminal charges, especially when the
NYPD has language access protocols in place and resources
available to address the needs of New York City's linguistically
diverse communities.  Given New York City's commitment to access
to justice regardless of language status, the NYPD's refusal to
administer a coordination test equally to all violates
defendant's federal and state equal protection rights.  For these
reasons, I dissent.

I.

Defendant was charged with operating a motor vehicle
while under the influence of alcohol or drug in violation of
Vehicle & Traffic Law §§ 1192 (1) and (3).  Defendant was
arrested after he collided with a police vehicle pulling out of a
precinct as defendant drove down the street.  According to the
arresting officer, defendant smelled of alcohol, his speech was
slurred, and he was unsteady on his feet.  Upon his arrest
defendant was taken to the Intoxicated Driver Testing Unit (IDTU)
at the 45th Precinct in the Bronx,[2] where he took a breathalyzer

---

[2]The only issue before the Court is the constitutionality of
the unofficial NYPD policy to withhold the coordination test from
LEP individuals at New York City IDTUs. These IDTUs are unique to
New York City, as the officers in all other municipalities in the

test which indicated a blood alcohol content (BAC) of .06, which was below the legal minimum for a per se violation.

Ordinarily, the IDTU would have offered defendant the opportunity to take a physical coordination test, as provided in the NYPD DWI Patrol Guide (Guide). The coordination test requires an arrestee to complete a series of simple tasks: reciting the person's name and address, standing straight-up with eyes closed, walking heel-to-toe for nine steps and turning to walk back to the starting point, standing on one leg, pointing to the tip of the nose with an index finger, and writing their signature or address. Pursuant to the Guide, an officer will typically demonstrate the tasks before asking the arrestee to complete them. Here, defendant was denied the test based on the basis of what the test administrator cursorily identified as a "language barrier."

Defendant moved to dismiss the accusatory instrument on the grounds that NYPD violated his federal and state equal protection and due process rights by failing to offer the test based on his language. The People opposed the motion, arguing both that NYPD has a legitimate interest in avoiding possible confusion by withholding the coordination test from non-English

---

state conduct sobriety tests roadside. Accordingly, the use of the IDTUs creates different expectations of NYPD, as NYPD officers have additional resources available to them for the processing of drunk drivers. Accordingly, I limit my analysis to the NYPD policy at IDTUs.

speakers and that defendant cannot have a due process interest in an investigatory procedure.

The nisi prius court stated that in the past it had addressed similar language-based claims by permitting defense counsel to cross-examine the People's witnesses on the failure to administer the test and providing an adverse inference charge regarding the Police failure to administer the test. However, in this case, the court granted the motion, concluding that where defendant's BAC was "so very low," denial of the coordination test "merely because he speaks only Spanish" violated his constitutional rights by failing to provide him with access to potentially exculpatory evidence. The court noted that under these circumstances "the trier of fact [] is likely to have a heightened interest in seeing a video memorializing the defendant's abilities."

The Appellate Term, First Department, reversed on the basis of People v Salazar (112 AD3d 5 [2013]), decided after the nisi prius court granted defendant's motion and before the People appealed, and which rejected similar constitutional challenges to the NYPD's policy of administering the coordination test only in English. A judge of this Court granted defendant leave to appeal (People v Aviles, 25 NY3d 1198 [2015]).


II.

Defendant renews his constitutional challenges to

NYPD's policy, and the People reassert that the policy is non-discriminatory and that it would be burdensome and unfeasible to administer the test other than in English. Defendant's equal protection claim has merit because the People's basis for denying him the test has no rational basis on the facts of this case.

Under both federal and state equal protection guarantees, government action that disadvantages a suspect class or burdens a fundamental right is subject to strict scrutiny and upheld only if there is a compelling justification for the action (Johnson v California, 543 US 499, 505 [2005]; Aliessa ex rel. Fayad v Novello, 96 NY2d 418, 431 [2001]). A facially neutral policy is also subject to strict scrutiny if the government's act has a disparate impact on a suspect class, so long as the discrimination is intentional (Washington v Davis, 426 US 229, 239 [1976]). Otherwise, government action is subject to the rational basis standard of review, which requires that the action be rationally related to a legitimate governmental purpose (Board of Trustees of Univ. of Ala. v Garrett, 531 US 356, 367 [2001]; see also Maresca v Cuomo, 64 NY2d 242 [1984]).

Here, defendant claims that he was discriminated against based on a suspect classification because the NYPD policy categorizes arrestees based on language, which defendant claims serves as a proxy for his national origin, a recognized suspect classification under both federal and state equal protection jurisprudence. In response, the People maintain that the test is

neutral on its face because a person of any national origin who
understands English may take the test.

In Soberal-Perez v Heckler (717 F2d 36 [2d Cir 1983],
cert denied 466 US 929 [1984]), decided in 1983, the Second
Circuit stated that "language, by itself, does not identify
members of a suspect class." That case involved a challenge to
the Department of Health & Human Services policy of sending
agency forms in English.  The court applied rational basis
review, holding that the Department had a legitimate interest in
providing its forms only in English because the government
conducts its affairs in English and "those who wish to become
naturalized United States citizens must learn to read English"
(id.)

However, since the Soberal-Perez decision, our nation's
understanding of the role language plays in our multi-ethnic
society has evolved.  In Hernandez v New York, a case involving a
prosecutor's peremptory challenges to Latino Spanish-speaking
prospective jurors, the United States Supreme Court recognized
that "it may well be, for certain ethnic groups and in some
communities, that proficiency in a particular language, like skin
color, should be treated as a surrogate for race under an equal
protection analysis" (500 US 352, 372 [1990] [internal citations
omitted]).  Indeed, a policy that affects all persons who speak a
given language "without regard to the particular circumstances"
of the surrounding events and individuals, may be found "to be

pretext for racial discrimination" (id. 371-372).

The judiciary is not alone in recognizing that language may serve as a proxy for national origin, ethnicity, and race. The Executive Branch has also acknowledged a link between language and discrimination and issued Executive Order 13166 on August 11, 2000 ("Improving Access to Services for Persons with Limited English Proficiency") to ensure compliance with Title VI's statutory prohibition against discrimination based on national origin in federally funded programs (42 USC § 2000d). To achieve its goal "to improve access to federally assisted programs and activities for persons who, as a result of national origin, are limited in their English proficiency" (65 Fed Reg 50, 121 [Aug 11, 2000]), the Executive Order requires federally assisted programs to draft guidance documents on how those programs will operate in a manner that is consistent with both Title VI and the Department of Justice's regulatory instructions.

The Department of Justice has provided guidance on Executive Order 13166, and helped municipalities to comply with Title VI and its implementing regulations (e.g. Office of the Attorney General, Federal Government's Renewed Commitment to Language Access: Obligations Under Executive Order 13166 [Feb 17, 2011]; US Department of Justice, Civil Rights Division, Language Access Assessment and Planning Tool for Federally Conducted and Federally Assisted Programs [May 2011]).  The Department of Justice has made clear that criminal suspects and other persons

in police custody are entitled to Title VI protections during encounters with police (2002 Title VI Guidance, 67 Fed Reg 41,455, 41,459 [June 18, 2002]).  It has further directed that recipients of federal funds subject to Title VI must take "reasonable steps to ensure meaningful access to their programs and activities by [limited English Proficient] persons" (id.).[3]

The limited view of the interrelationship of language, ethnicity, and national origin as articulated in Soberal-Perez, does not represent today's nuanced appreciation of how language historically affects access to justice for groups based on national origin.  With an eye to this continued reality, the Court should safeguard against the use of English-only policies because "[t]he dominant cultural group can manipulate language as a device for exclusion of disfavored groups whose mother tongue is not English" (Kiyoko Kamio Knapp, Language Minorities: Forgotten Victims of Discrimination?, 11 Geo Immigr LJ 747, 752-753 [1997]).

---

[3]In the Title VII context, the Equal Employment Opportunity Commission (EEOC) has acknowledged the interconnectedness of language and national origin, and that neutral language policies can mask discriminatory animus and disparate treatment. As such, the EEOC guidelines broadly define national origin discrimination to include "linguistic characteristics of a national origin group" for the purposes of Title VII enforcement (29 CFR § 1606.1). The EEOC further advises employers that "[t]he primary language of an individual is often an essential national origin characteristic" (id. § 1606.7). Relatedly, the Southern District of New York has recently applied the EEOC's interpretation to hold that an English-only policy in the workplace violated Title VII's prohibition on national origin discrimination (EEOC v Sephora USA, LLC, 419 F Supp 2d 408 [SDNY 2005]).

Notably, compliance with legal mandates as a means for equal treatment of all members of our multilingual society can be realized through the government's use of technological advances and increased human resources that address linguistic needs and simultaneously contain costs.  This is especially true in New York City, where the population of limited English speakers is nearly two million people (New York City Mayor's Office of Immigrant Affairs, Constituent Facts & Maps).  In recognition of the needs of its diverse communities and of its legal obligations, New York City has issued an Executive Order directing its agencies to provide language services in compliance with Title VI (Exec Order 120, Citywide Policy on Language Access to Ensure the Effective Delivery of City Services [July 22, 2008]; see also NYC Mayor's Office of Operations, Language Access Services Initiative). NYPD also developed a Language Access Plan and issued internal procedures that govern law enforcement service provision to persons who are not fluent in English (New York Police Department, Language Access Plan [June 14, 2012]; New York Police Department Patrol Guide, Procedure No: 212-90, Guidelines for Interactions with Limited English Proficient [LEP] Persons). NYPD's official Language Access Plan encourages officers either to use a multi-language telephonic service known as "Language Line"[4] to handle most of its interpretation needs,

---

[4]Language Line is a private company that provides on-demand interpretation through the telephone, 24-hours a day. People in need of interpretation call in to connect with an interpreter,

or to contact officers that are certified through NYPD's Language

Initiative Program, which trains NYPD officers in critical

languages (Language Access Plan at 4-5).  Comparatively, NYPD's

Patrol Guide prompts officers to rely on other officers who self-

identify as bilingual (Guidelines for Interactions with Limited

English Proficient [LEP] Persons at 1).[5]

     This deliberate application of language services

applies to the IDTU, where, for example, consent to administer

the breathalyser test is obtained by a video in Spanish (see

People v Salazar, 112 AD3d 5, 7-8 [1st Dept 2013] [explaining how

officers obtain consent to administer the breath test using an

interpretive video]; People v Rosario, 136 Misc 3d 445, 447-448

---

who can immediately facilitate a conversation between two or more
people who do not speak the same language (Language Line
Solutions, Phone Interpreting, https://www.languageline.com
/interpreting/phone [last accessed Nov 10, 2016]).

[5] The record on appeal is thin, and the People failed to
submit any information about NYPD's language resources. Yet,
defense counsel submitted NYPD's Language Access Plan, NYPD's
field guide for serving LEP individuals, and other supporting
documents, all of which the Court is permitted to take judicial
notice (see Affronti v Crosson, 95 NY2d 713, 720 [2001]). Thus,
the majority's contention that there is no record support for the
claim that NYPD is equipped to interact with LEP individuals is
false, as these publicly-available documents indicate that NYPD
both intends to and is capable of doing so.

     Contrary to the majority's assertion, defendant preserved
his claim that NYPD's policy of denying the test based on
language is unconstitutional because NYPD is capable of providing
interpretative services. Therefore, it is wholly proper and
prudent to consider all public documents regarding both NYPD's
and the City's linguistic resources (see Affronti, 95 NY2d at
720).

[Bronx County Crim Ct 1987] [same]). Similarly, NYPD has
previously relied on bilingual officers to deliver the
instructions on how to take the breathalyser test (see Salazar,
112 AD3d at 8).

Given New York City's commitment to language access and
the resources available to the NYPD, the policy here does not
survive even rational basis review. Furthermore, the NYPD policy
is not rationally related to a legitimate governmental purpose
for the separate reason that by denying defendant the test, NYPD
forfeits an opportunity for the People to gather evidence of
intoxication. If, as the People claim, the ultimate goal is to
ensure the safety of our roadways, the policy falls short.[6]

Nevertheless, the People maintain that the policy is
rationally related to its interest in ensuring the reliability of
the coordination test.  According to the People, the test can
only be administered by a specially trained officer who cannot
rely on any type of interpreter service to communicate the test
instructions to the arrestee.  The accuracy of this assertion is
neither intuitive nor obvious, and the People failed to present

_____

[6] The majority contends that NYPD's goal in withholding the
test is "avoiding delayed or erroneous results due to language
barrier" (maj op at 8). Contrary to this assertion, the NYPD
policy does not rationally further any legitimate goal, as NYPD
has the available means for immediate and accurate interpretive
services that would eliminate both the delay in testing and the
potential for error. The majority's claim that the NYPD goal is
to avoid detrimental results is unsupported by the record because
there is no factual or scientific basis propounded by defendant
for such a claim.

evidence in support of their claim that there is no other way to maintain the integrity of the test, or that they are unable to deploy test administrators fluent in the languages most often in demand.[7]  More troubling is that the only source of this information about the difficulty in administering the coordination test is contained in an prosecutor's affirmation, submitted to the nisi prius court in opposition to defendant's motion to dismiss. The People provided no evidence to support the contention that the coordination test is difficult to administer, but instead ask this Court to credit their claims. Despite the majority's uncritical acceptance of the People's mantra that they cannot administer this test in a language other than English, we must decline the People's invitation to take them at their word. Indeed, where defendant's constitutional rights are at stake, our review of the policy and the People's reasons should be especially punctilious.

_____

[7] I need not define the most in demand languages, despite the majority's suggestion otherwise (maj op at 9), because there is governmental consensus in New York City about its population's linguistic needs. NYPD's Language Access Policy identifies its "baseline languages" as Spanish, Chinese, Korean, Haitian Creole, Russian and Italian (New York Police Department, Language Access Plan at 10 [June 14, 2012]). The New York City Human Rights Law mandates that all City services and documents be provided in the same "covered languages" (NYC Admin Code §§ 8-1001, 8-1003). Executive Order 120 also requires that all of New York City's services be provided in these six languages (City of New York Office of the Mayor, Executive Order 120, Citywide Policy on Language Access to Ensure the Effective Delivery of City Services [July 22, 2008]). Thus, the city government has identified those languages most spoken.

The People's arguments are also unpersuasive because the NYPD's own Language Access Plan for serving LEP individuals provides for a different result, and a close examination of the coordination test belies the claim. The physical coordination test involves no mechanical or technical manipulation and depends only on telling the person to make certain physical movements. The People fail to explain why the same mechanisms available to instruct in a language other than English on the rights and the use related to the breathalyzer test cannot be employed or modified for purposes of the coordination test. Indeed, the instructions for the coordination test are far more simple than those required to obtain consent to perform the breathylzer test. The coordination test is comprised of short, declarative statements that can easily be translated, e.g. "touch your nose with your forefinger" (toque su nariz con el dedo), "walk in a straight line" (camine en linea derecha), or "raise your right leg" (levante la pierna derecha). The People's argument contradicts common sense.[8]

---

[8] The majority's characterization of this test as difficult to administer is based on an affirmation of an Assistant District Attorney. However, the People failed to submit either evidence from an experienced administrator who has first-hand knowledge about the test's complexity or expert linguistic testimony concerning the need for instruction to be provided solely by the test administrator in English. Absent such evidence, the People's "proof" is but a shell. Yet, the majority adopts the People's argument while disregarding that NYPD has a variety of tools it can use to administer this test in a manner that does not violate defendant's constitutional rights.

The fact is that NYPD already does far more to address language barriers in the field, where access to a bilingual officer or an interpreter is less controlled. Despite the challenges, the official NYPD policy requires officers to make efforts to communicate with LEP individuals out of recognition of "the importance of effective and accurate communication between its employees and the community they serve."[9] Accordingly, NYPD does not have a legitimate interest in maintaining its current policy and its denial of the test to defendant violated his rights to equal protection under the law.[10]

## III.

It is beyond cavil that the criminal justice system cannot advance procedures that benefit certain individuals but disadvantage others. Yet, the majority approves a system of justice in which English speakers are given access to potentially exculpatory evidence in DWI cases, while the same beneficial

---

[9]The NYPD has long been on notice that failing to address language needs is a violation of Title VI disparate impact regulations, based on national origin. In 2010, the Department of Justice issued a report in which it informed NYPD that it was not in full compliance with Title VI. The report indicated that officers frequently departed from NYPD's internal policy when interacting with LEP individuals because NYPD did not provide sufficient translation services. NYPD responded by updating its Language Access Plan.

[10]Since defendant has established a meritorious equal protection challenge, I have no occasion to address his due process claim.

process is denied to those whose English language skills are limited due to their national origin. Such diminished treatment under the law is unconstitutional and counter to our sensibilities of fairness.  It is especially unacceptable where the means to ensure equality are within reach.

For the reasons I have explained, I would reverse the Appellate Term and dismiss the accusatory instrument. Therefore, I dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Garcia.  Chief Judge DiFiore and Judges Pigott, Abdus-Salaam and Stein concur.  Judge Rivera dissents in an opinion in which Judge Fahey concurs.

Decided November 22, 2016